No. 23-35352

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WILDEARTH GUARDIANS, WESTERN WATERSHEDS PROJECT, and
WILDERNESS WATCH,

*Plaintiff–Appellants*;

v.

UNITED STATES FOREST SERVICE and UNITED STATES FISH &
WILDLIFE SERVICE,

*Defendant–Appellees*; and

IDAHO FISH & GAME COMMISSION, STATE OF WYOMING,

*Intervenor-Defendant-Appellees*

On Appeal from the United States District Court
for the District of Idaho, Hon. Magistrate Judge Dale

**APPELLANTS' OPENING BRIEF**

SANGYE INCE-JOHANNSEN
PETER M. K. FROST
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
1.541.778.6626, 1.541.359.3238
*Attorneys for Plaintiff-Appellants*                September 27, 2023

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellants WildEarth Guardians, Western Watersheds Project, Wilderness Watch, and Friends of the Clearwater have no parent corporations and issue no stock. FED. R. APP. P. 26.1(a).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iii

JURISDICTIONAL STATEMENT ..................................................................... 1

STATEMENT OF ISSUES ................................................................................. 2

STATEMENT OF THE CASE ............................................................................ 2

    A. Background on the Endangered Species Act. ............................................. 2

    B. Factual Background. .................................................................................. 5

        1. Grizzly Bears in the Lower 48 States. .................................................. 5

        2. Federal Defendants' Consultation over Bait in Grizzly Habitat ............... 9

        3. Continued Baiting Within Expanded Grizzly Range and Numbers ........ 16

        4. Baiting and Grizzly Mortalities. ......................................................... 17

    C. District Court Proceedings. ...................................................................... 19

STANDARD OF REVIEW ............................................................................... 20

SUMMARY OF THE ARGUMENT ................................................................. 20

ARGUMENT ................................................................................................... 22

    A. The National Policy is "Agency Action" under Section 7. .......................... 22

    B. The Forest Service Retains Discretionary Involvement and Control. .......... 28

    C. New Information Exists That Was Not Previously Considered. .................. 30

CONCLUSION ................................................................................................ 33

CERTIFICATE OF COMPLIANCE ................................................................. 34

# TABLE OF AUTHORITIES

Cases:

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*,
   273 F.3d 1229 (9th Cir. 2001) ........................................................... 4, 5

*Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv.*,
   789 F.3d 1075 (9th Cir. 2015) ................................................. 20, 27, 30

*Crow Indian Tribe v. United States*,
   965 F.3d 662 (9th Cir. 2020) .......................................................... 6, 16

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
   36 F.4th 850 (9th Cir. 2022) ................................................... 24, 25, 27

*Friends of the Clearwater v. U.S. Forest Serv.*, No. 3:20-CV-00322-BLW,
   2021 WL 3408595 (D. Idaho Aug. 4, 2021) ................................. 31, 32

*Greater Yellowstone Coalition, Inc. v. Servheen*,
   665 F.3d 1015 (9th Cir. 2011) ................................................................ 5

*High Sierra Hikers Ass'n v. Blackwell*,
   390 F.3d 630 (9th Cir. 2004) ............................................................... 20

*Karuk Tribe of California v. U.S. Forest Service*,
   681 F.3d 1006 (9th Cir. 2012) ..................................................... *passim*

*Kleppe v. New Mexico*,
   426 U.S. 529 (1976) ..................................................................... 24, 29

*Nat'l Family Farm Coal. v. EPA*,
   966 F.3d 893 (9th Cir. 2020) ............................................................... 20

*Nat. Res. Def. Council v. Forest Service*,
   421 F.3d 797 (9th Cir. 2005) ............................................................... 20

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................. 27

*San Luis & Delta-Mendoza Water Auth. v. Locke*,
    776 F.3d 971 (9th Cir. 2014) .................................................................. 3

*Sierra Club v. Babbitt*,
    65 F.3d 1502 (9th Cir. 1995) ............................................................... 28

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ............................................................................ 3

*W. Watersheds Project v. Matejko*,
    468 F.3d 1099 (9th Cir. 2006) ........................................................ 25, 26

*WildEarth Guardians et al. v. Forest Service et al.*,
    No. 1:19-cv-00203-CWD (D. Idaho) ................................................. 19, 20

*Wild Fish Conservancy v. EPA*,
    331 F. Supp. 3d 1210 (W.D. Wash. 2018) ........................................... 30

<u>Statutes</u>

5 U.S.C. § 706 ...................................................................................... 20

16 U.S.C. § 528 .................................................................................... 29

16 U.S.C. § 551 .................................................................................... 29

16 U.S.C. § 1531 ............................................................................ 2, 3, 29

16 U.S.C. § 1532 ................................................................................... 4

16 U.S.C. § 1536 ........................................................................... *passim*

16 U.S.C. § 1538 ................................................................................... 4

16 U.S.C. § 1540 ................................................................................... 1

16 U.S.C. § 1604 .................................................................................. 29

28 U.S.C. § 1291 ................................................................................... 1

28 U.S.C. § 1331 ..................................................................................1

Regulations:

50 C.F.R. § 402.02 ................................................................4, 22, 24, 26

50 C.F.R. § 402.14 .............................................................................3, 5

50 C.F.R. § 402.16 .......................................................................*passim*

Other:

*Amendment Listing the Grizzly Bear of the 48 Conterminous States*
    *as a Threatened Species*, 40 Fed. Reg. 31,734 (July 28, 1975) ..........................6

*Use of Bait in Hunting*, 59 Fed. Reg. 11,765 (Mar. 14, 1994)...........................9, 10

*Use of Bait in Hunting*, 60 Fed. Reg. 14,720 (Mar. 20, 1995)........................*passim*

*Record of Decision Concerning Grizzly Bear Recovery*
    *in the Bitterroot Ecosystem*, 65 Fed. Reg. 69,644 (Nov. 17, 2000)................7, 8

*Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears*
    *from the Federal List of Endangered and Threatened Species*,
    82 Fed. Reg. 30,502 (June 30, 2017) ....................................................6, 7, 8, 31

FED. R. APP. P. 4 ..................................................................................1

FED. R. APP. P. 26.1 ..............................................................................*i*

FED. R. APP. P. 32 ................................................................................34

FED. R. CIV. P. 54 ................................................................................1

OXFORD AMERICAN DICTIONARY, Mobile App Version 15.7 ................................23

# JURISDICTIONAL STATEMENT

On June 5, 2019, Plaintiff-Appellants WildEarth Guardians *et al.* ("Conservationists") filed this lawsuit in the U.S. District Court for the District of Idaho. Excerpts of Record ("ER") ER-227, 230. The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g)(1)(A). The District Court's order on summary judgment became appealable after entry of final judgment. FED. R. CIV. P. 54(b). The District Court entered final judgment on March 21, 2023. ER-3. Conservationists filed a notice of appeal on May 20, 2023. ER-224. This appeal is timely because it was filed within 60 days after entry of judgment. FED. R. APP. P. 4(a)(1)(B). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. When the Forest Service adopts a National Policy allowing or prohibiting the use of bait for hunting in national forests depending on state law; retains supervisory and monitoring control over any baiting that is allowed; and mandates federal action if baiting conflicts with federal interests, has it undertaken "action" under Section 7 of the Endangered Species Act?

2. When, after the Forest Service adopted its policy, the number and distribution of grizzlies in two ecosystems have increased significantly; grizzlies have been killed at black bear bait sites; and movement of grizzlies needed to recolonize the most important ecosystem in the lower 48 states is inhibited by continued baiting, is there "new information" revealing effects of the action in a manner or to an extent not previously considered, requiring reinitiation of consultation?

## STATEMENT OF THE CASE

### A.     Background on the Endangered Species Act.

Congress enacted the Endangered Species Act (ESA) in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Congress declared that all federal agencies "shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance" of

the ESA's purposes. 16 U.S.C. § 1531(c). The ESA requires federal agencies "to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).

Section 7 of the ESA requires every federal agency, in consultation with either the U.S. Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service, to insure its actions are "not likely to jeopardize the continued existence of any endangered . . . or threatened species or result in the destruction or adverse modification of" an endangered or threatened species' critical habitat. 16 U.S.C. § 1536(a)(2).[1] If the agency finds evidence of an adverse impact on a listed species, it must initiate formal consultation with FWS. 50 C.F.R. § 402.14. If formal consultation is necessary, FWS must prepare a biological opinion ("BiOp") that determines whether the action is likely to result in jeopardy to the species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b).[2]

---

[1]  This case concerns FWS, which listed and administers recovery of grizzly bears in the lower 48 states.

[2]  In carrying out consultation, FWS must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). "[F]ailure to do so violates the APA." *San Luis & Delta-Mendoza Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (*en banc*). The purpose of the "best scientific and commercial data" standard is to ensure a BiOp is not based on "speculation and surmise." *Id*. (citing *Bennett v. Spear*, 520 U.S. 154, 176 (1997)).

ESA regulations define agency "action" under Section 7 as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies[,]" including but "not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02. This Court has established a two-part test for determining whether agency "action" under Section 7 exists: "First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe of California v. U.S. Forest Service*, 681 F.3d 1006, 1021 (9th Cir. 2012) (*en banc*).

The ESA also prohibits "take" of listed species. 16 U.S.C. § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect[.]" 16 U.S.C. § 1532(19). Once FWS has determined an action is not likely to jeopardize a listed species or destroy or modify its critical habitat, it must determine whether the action is likely to result in any "incidental take" of endangered or threatened species. *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir. 2001). If FWS determines the action "is reasonably certain" to result in incidental take, it must issue an incidental take

4

statement ("ITS"). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).[3] An ITS

"functions as a safe harbor provision immunizing persons" for take liability. *Ariz.*

*Cattle Growers' Assn.*, 273 F.3d at 1239. Finally,

> Reinitiation of consultation is required and shall be requested by the
> Federal agency or by the Service, where discretionary Federal
> involvement or control over the action has been retained or is
> authorized by law and: (1) If the amount or extent of taking specified
> in the incidental take statement is exceeded; [or] (2) If new information
> reveals effects of the action that may affect listed species or critical
> habitat in a manner or to an extent not previously considered[.]

50 C.F.R. § 402.16(a).

## B.    Factual Background.

### 1.    Grizzly Bears in the Lower 48 States.

The grizzly bear (*Ursus arctos horribilis*) is "one of the American West's

most iconic wild animals." *Greater Yellowstone Coalition, Inc. v. Servheen*, 665

F.3d 1015, 1019 (9th Cir. 2011). Grizzlies are "both revered and feared as a

symbol of wildness, independence, and massive strength." *Id*. Before the arrival of

Europeans, grizzlies roamed the western United States and most of Alaska,

numbering approximately 50,000 individuals. *Removing the Greater Yellowstone*

*Ecosystem Population of Grizzly Bears from the Federal List of Endangered and*

---

[3]   An ITS must (i) specify the impact of incidental taking; (ii) specify reasonable
and prudent measures that are necessary or appropriate to minimize such impact;
… and (iv) set forth the terms and conditions that the agency and/or third party
must comply with in order to implement specified reasonable and prudent
measures. 16 U.S.C. § 1536(b)(4)(C).

*Threatened Species*, 82 Fed. Reg. 30,502, 30,508 (June 30, 2017). Subsequently, human settlement and government bounty programs extirpated 31 of 37 grizzly populations, and left grizzlies in less than two percent of the species' historic range in the lower 48 states. *Id*.

In 1975, FWS listed grizzly bears in the lower 48 states as threatened with extinction under the ESA. *Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species*, 40 Fed. Reg. 31,734 (July 28, 1975). One factor FWS cited in its decision to list grizzlies is that in the relatively few places where populations occur, they are "isolated from other populations so that they cannot be reinforced, either genetically or by movement of individual bears." *Id*.

In 1982, FWS issued a Grizzly Bear Recovery Plan that groups grizzlies into six "recovery ecosystems." ER-85, 90–91. The Recovery Plan states that to delist the species, FWS would need to establish recovery of at least three populations in three distinct grizzly bear ecosystems. *Id*. at 90. Since listing, grizzly populations have grown in the Greater Yellowstone Ecosystem ("GYE") in northwestern Wyoming, eastern Idaho, and southeastern Montana; and in the Northern Continental Divide Ecosystem ("NCDE") in north-central Montana. *Crow Indian Tribe v. United States*, 965 F.3d 662, 672 (9th Cir. 2020). That is not the case,

however, in the Bitterroot Ecosystem in Idaho.[4] FWS has found that the Bitterroot

Ecosystem "has the best potential for grizzly bear recovery," because it "offers

excellent potential to support a healthy population of grizzly bears" that would

"boost long-term survival and recovery prospects for this species in the contiguous

United States." *Record of Decision Concerning Grizzly Bear Recovery in the*

*Bitterroot Ecosystem*, 65 Fed. Reg. 69,644 (Nov. 17, 2000). There are currently no

known resident grizzlies in the Bitterroot Ecosystem. ER-75.

Nonetheless, in 2017, FWS found that "grizzly bears have nearly doubled

their occupied range since the early 1980s" in the lower 48 states, primarily onto

lands outside of the GYE and NCDE recovery zones, bringing them closer to the

Bitterroot Ecosystem. 82 Fed. Reg. at 30,511. In 2020, FWS published a map

depicting the grizzly recovery zones, a larger area surrounding the GYE and

NCDE recovery zones denoted as "Estimated current distribution," and a still

larger area denoted as "Grizzly bears 'may be present.'" ER-57. This map is

intended to "help federal agencies determine where effects to [grizzlies] should be

considered for consultation from actions they carry out, fund, or permit." *Id*. More

recently, in 2021, FWS published a map showing recovery zones, the estimated

---

4    The other three recovery zones are the Cabinet-Yaak, the Selkirk, and the North
Cascades Ecosystems. ER-91. None of these ecosystems has met recovery goals
either.

current distribution of grizzlies, and documented individual "outliers" from distribution during the years 2011 to 2021. ER-71.

FWS has found that the movement and survival of grizzlies between recovery ecosystems matters as to the genetic health of grizzlies within populated ecosystems, 82 Fed. Reg. at 30,535, and also to any recolonization of areas such as the Bitterroot Ecosystem. 65 Fed. Reg. at 69,644. FWS "recognize[s] the GYE grizzly bear population could be a possible source population to re-colonize the Bitterroot Ecosystem to the west." 82 Fed. Reg. at 30,536. Similarly, in 2021, FWS noted "the NCDE and [Bitterroot Ecosystem] are less than 5 km (3 mi) apart and multiple verified sightings have occurred" between them. ER-80.

This case is about the overlap between where grizzlies may be present in national forest lands in Idaho and Wyoming and where those states allow the use of bait to hunt black bears. FWS has found that "[t]he primary factors affecting grizzly bears at both the individual and ecosystem levels are excessive human-caused mortality and human activity that reduces the quality and quantity of habitats, which increases the potential for human-caused mortality, both directly and indirectly." ER-76. FWS has also found that hunting over bait "can be a source of mortality (due to mistaken identity killings) and conflicts (due to conditioning to human foods)." ER-81. Moreover, independent of grizzly killings, FWS has also noted that "[m]anagement removal of nuisance bears, particularly food-conditioned

bears, has been the second highest cause (31 percent) of human-caused mortalities

in the [GYE] from 1992 to 2001." ER-125.



*Figure 29. Estimated distribution of grizzly bears in the NCDE (2011–2020 data), GYE (2006–2020 data), CYE (2005–2019 data), and SE (2005–2019 data), and verified grizzly bear outlier observations between the ecosystems based on data from 2011 to June 14, 2021.*

    2.    <u>Federal Defendants' Consultation Over Bait in Grizzly Habitat.</u>

"Baiting" in the context of hunting means to use "food or scent to attract

wildlife." *Use of Bait in Hunting*, 59 Fed. Reg. 11,765, 11,766 (Mar. 14, 1994).

Through the early 1990s, ten states, including Idaho and Wyoming, authorized

hunters to use bait to hunt black bears. ER-132. Generally, states authorize use of bait to hunt black bears during fall and spring hunting seasons. *See*, *e.g.*, ER-144. These are the periods before and after bears hibernate; in the fall, when black bears are trying to gain enough food (called "hyperphagia") to survive denning in the winter, and in the spring, when they are especially hungry because they recently emerged from dens. *Id*. States like Wyoming have set limits on how many female black bears who may have had cubs during hibernation can be shot during the hunting seasons. ER-144 (closing areas to bear hunting when "female mortality quota is reached.").

From the 1960s through 1992, the Forest Service required hunters to obtain special use permits to use bait to hunt in national forests in Wyoming and in other states. ER-132. In March 1992, the Forest Service decided to discontinue requiring special use permits in national forests in Wyoming, and instead to consider issuing closure orders prohibiting baiting except where allowed. 59 Fed. Reg. at 11,766. The Forest Service was sued for switching from special use permits to closure orders without analyzing effects on black bears under the National Environmental Policy Act ("NEPA"). *Id*. The parties settled, and the Forest Service agreed to prepare a NEPA analysis to consider whether to require special use permits for baiting in national forests in Wyoming. *Id*.

In February 1993, the Forest Service published an Environmental

Assessment ("EA") to evaluate effects of baiting in national forests in Wyoming.

ER-193–223. In March 1993, the Forest Service published a Biological Evaluation

under Section 7 of the ESA that explained the preferred alternative's effects on

grizzlies:

> The proposed action and preferred alternative is to discontinue issuing special use permits to authorize bear baiting locations, close all designated Wilderness to bear baiting, beginning in 1994, and through a Memorandum of Understanding with the Wyoming Game and Fish Commission regulate noncommercial black bear baiting on National Forest System lands through Wyoming Game and Fish Commission Trophy Game Regulations (alternative 4). In addition to these Trophy Game Regulations listed below, the following mitigation measures are for all alternatives, including the preferred (Alternative 4), until such time as they become State Regulations[.]

ER-182. The "mitigation measures" in the EA included: (1) prohibiting baiting in

the GYE recovery zone; and (2) outside of the recovery zone, prohibiting baiting

where the Forest Service otherwise prohibits "the improper storage of food in

grizzly bear habitat." ER-210–11. In April 1993, the Forest Service issued a

Decision Notice to adopt the proposed alternative in the 1993 EA. ER-168–80.

In April 1993, the Forest Service requested Section 7 consultation with FWS

to obtain its opinion as to effects of the proposed action in the 1993 EA on listed

species, including grizzlies. ER-158. FWS issued a BiOp the same month. *Id*. The

BiOp states that "baiting for black bears" that "occurs within the range of the

grizzly bear" can result in mortality to grizzlies, if a hunter mistakes a grizzly for a

black bear or perceives a grizzly threatens the hunter's safety. ER-161. The BiOp states grizzlies may become "conditioned" to foods used in baiting and seek them elsewhere, and become "problem" bears requiring "management actions." *Id*. The BiOp states that between 1967 and 1993, five grizzlies were "reported shot" at black bear bait sites in Wyoming. ER-162. The BiOp finds the mitigation measures in the 1993 EA, including "[c]losing the proposed grizzly bear recovery zone and all areas covered by a special order prohibiting improper storage of food in grizzly bear habitat (mitigation measures common to all alternative[s]) will have a beneficial affect [*sic*] on grizzly bears." ER-159. Based on the mitigation measures, FWS found none of the alternatives in the 1993 EA would jeopardize grizzlies. ER-163.

However, FWS found a "remaining potential for incidental take of grizzly bears" due to the use of bait to hunt black bears, so it issued an ITS that includes mandatory terms "critical to fulfillment of [the Forest Service's] responsibilities" under Section 7. ER-163–64. First, the Forest Service must "[e]liminate the use of processed human, livestock or pet foods, and fruits and vegetables produced for human consumption, as bear baits in any areas regularly used by grizzly bears[.]" ER-164. Second, the Forest Service "has a continuing duty to regulate the activity covered by this incidental take statement." *Id*. Third, FWS found that:

> Although there is a remote possibility that a grizzly bear may be taken
> as a result of black bear baiting on [Forest Service] lands in Wyoming,

[FWS] does not anticipate that such take will occur. Therefore, no incidental take is allowed. Should any take occur, the [Forest Service] must reinitiate formal consultation with [FWS] and provide the circumstances surrounding the take.

*Id*.

However, facing "new challenges to the [Forest Service's] position in the form of administrative appeals," in May 1993 the Forest Service decided that "national direction was needed to end the conflict and controversy." ER-147. In July 1993, the Forest Service rescinded its 1993 EA and Decision Notice and issued a joint closure order prohibiting all bear baiting in national forests in Wyoming pending national direction as to the use of bait. ER-157.

With the joint closure order in effect, the Forest Service anticipated a national bait policy would allow baiting to recur. *Id*. In February 1995, the Forest Service wrote FWS that it was "in the process of preparing a National Policy on bear baiting[.]" ER-156. It wrote:

As a result of the mitigation measures in the [1993] EA and the reasonable and prudent alternatives in the [BiOp], we implemented a closure order prohibiting the use of bait for black bear hunting in the [GYE] recovery zone, in the food restrictions areas on the Wind River Ranger District, Shoshone National Forest, and prohibited hunting of black bears with non-natural baits in grizzly habitat not covered by the other closure orders.

*Id*. It noted that "[t]he [1993] EA was rescinded but the closure orders are still in effect." *Id*. It added that in "accordance with one of the conservation recommendations [in the BiOp], an additional area on the Greybull District,

Shoshone National Forest, has been closed since the [BiOp] was issued." *Id*. It

concluded: "We ask that you review the original [BiOp] in light of this proposed

new policy, and the actions we have taken, to determine if you concur that the

actions we have taken to protect the grizzly bear are still adequate." *Id*.

The same month, FWS responded to the Forest Service's letter, concluding

that "[t]he proposed National Policy appears to be consistent with our biological

opinion of April 14, 1993, and no information has become available to suggest that

additional terms and conditions are necessary at this time." ER-155. In March

1995, the Forest Service issued an EA under NEPA to evaluate adopting a national

bait policy. ER-126.

The National Policy states:

Where States permit the use of bait for attracting resident game, this
activity is allowed on National Forest Service lands, subject to State
hunting laws and regulation, unless the authorized officer determines
on a site-specific basis that there is a need to prohibit or restrict the
practice.

*Use of Bait in Hunting*, 60 Fed. Reg. 14,720, 14,723 (Mar. 20, 1995). The policy

states the Forest Service will "monitor State regulations" to ensure they "protect

Federal interests." *Id*. at 14,721. The policy explains that if "bait conflicts with

Federal law or regulations, forest plan direction, or other uses or users . . . the

authorized officer could prohibit or restrict the use of bait, in an area, by issuing a

closure order." *Id*. at 14,720. Before issuing a closure order, the officer "would

first consult with the State fish and wildlife agency to see if the conflict could be resolved without a closure or restrictive order," but "the Forest Service would close specific areas to baiting if conflicts cannot be resolved[.]" *Id*. at 14,720–21. The policy states "the authorized officer must close an area to baiting" if circumstances arise, including if "State laws and regulations conflict with Federal law, such as the Endangered Species Act." *Id*. at 14,721.

In March 1995, FWS responded to a letter from the Forest Service "requesting concurrence" with the Forest Service's finding that its "proposed national policy on use of bait during hunting on National Forest Service lands is not likely to adversely effect [*sic*] federally listed species." ER-153. FWS noted that the National Policy requires the Forest Service to monitor state baiting regulations, "and to establish administrative closures to baiting where necessary to protect federally listed species." *Id*. FWS referred to other documents "clarifying certain issues," and noted the two agencies' staff had agreed to "revisions to the proposed policy." *Id*. Ultimately, FWS issued its concurrence with the Forest Service under Section 7 that the National Policy "is not likely to adversely affect federally listed species," including grizzlies. *Id*. On March 20, 1995, the Forest Service issued a Decision Notice and promulgated the National Policy. ER-146– 53.

3.    <u>Continued Baiting Within Expanded Grizzly Range and Numbers.</u>

The BiOp states "grizzly bears are known to travel widely, and may visit black bear baits well outside of the currently known range of the species." ER-162. However, when FWS wrote the BiOp, it evaluated potential effects on grizzlies of continued baiting in Wyoming alone, not in Idaho. ER-158.[5] And FWS premised its determination of the effects of baiting on a GYE population of 228 grizzlies. ER-161. These assumptions were carried forward in the agencies' informal consultation in 1995. ER-153. As of six years ago, there were roughly 700 grizzlies in the GYE, and 900 grizzlies in the NCDE, which extends to within 3 miles of the Bitterroot Ecosystem. *Crow Indian Tribe*, 965 F.3d at 672 (populations); ER-080 (NCDE and Bitterroot distance).

The EA determines that "[n]early all of the occupied grizzly habitat has been closed to bear baiting and the small portion that has not has special requirements and education programs for hunters." ER-139. But as noted, distribution of grizzlies has grown far outside of the GYE and NCDE recovery zones, and individual grizzlies have been verified outside of the acknowledged distribution, and the Bitterroot Ecosystem. ER-71.

---

[5]  Montana does not allow the use of bait to hunt black bears, MONTANA CODE ANNOTATED 87-6-401, so that lessens risks to grizzlies from the NCDE, but only if they remain in the state, and do not move into Idaho or Wyoming.

By 2019, the Forest Service noted numerous areas within the distribution of grizzlies in Idaho and Wyoming where the states authorize the use of bait. ER-109 (in the Idaho portion of GYE, "grizzly distribution extends well beyond the [primary conservation area] into areas of ID where baiting is allowed"); *id.* (in the Wyoming portion of the same ecosystem, "there are significant areas within occupied grizzly bear range where baiting is allowed"); *id.* (in northern Idaho, grizzlies "occasionally occur" outside of where baiting is prohibited near the Selkirk and Cabinet-Yaak Ecosystems). For example, in June 2019, a grizzly was documented during the hunting season near a bait site in the Kelly Creek drainage of the Nez Perce-Clearwater National Forests in Idaho. ER-066–67. As another example, Idaho allows baiting within the Caribou-Targhee National Forest in eastern Idaho, where a grizzly sow and her cub were recently documented. ER-057–58.[6]

4.    <u>Baiting and Grizzly Mortalities.</u>

---

[6]    Since adopting its National Policy, the Forest Service has issued closure orders prohibiting food storage where grizzlies may be present in national forests in Idaho, to prevent grizzly-human conflict, but exempted the continued use of bait to hunt black bears. As examples, in September 2001, January 2010, and June 2016, the Forest Service prohibited food storage or processing in parts of the Caribou-Targhee, Shoshone, Bridger-Teton, and Idaho Panhandle National Forests, respectively. ER-122, ER-117, ER-111. In each case, however, the Forest Service exempted bait for use in bear hunting. *Id.*; *see also* ER-62–63 ¶ 8.

Since the Forest Service adopted the National Policy, at least two grizzlies have been killed by black bear hunters using bait in national forests in Idaho and Wyoming. On May 28, 2007, a hunter seeking black bears and using bait killed a grizzly bear on Dutch Joe Creek in the Bridger-Teton National Forest in Wyoming. ER-106 ¶ 56 & ER-103 ¶ 56. On September 3, 2007, a licensed hunter seeking black bears and using bait killed a grizzly bear in the North Fork Clearwater watershed, in what was then the Clearwater National Forest and is now the Nez Perce Clearwater National Forest in Idaho. ER-106–07 ¶ 57 & ER-103 ¶ 57; ER-94 ¶ 57. At the time, this was the first grizzly verified in the Bitterroot Mountains since 1946. *Id*.

The number of grizzlies killed at black bear bait sites in national forests in Idaho and Wyoming since the National Policy was adopted may be greater than these admissions, because some reports of grizzly mortalities caused by hunters do not disclose whether bait was present, or do not precisely identify locations to determine whether the incident took place in a national forest. For example, the State of Wyoming admitted that on April 24, 2001, a black bear hunter killed a grizzly near a bait site in Rock Springs Canyon in Wyoming, ER-106 ¶ 50, ER-97 ¶ 1, but the mortality report does not identify whether the mortality occurred on Forest Service land. ER-60. Similarly, although the Forest Service admitted two other grizzly mortalities occurred at bait stations in national forests, ER-102 ¶¶ 49,

52, it later represented that at least one mortality occurred at a bait site on private

land. ER-053.

## C.     District Court Proceedings.

On June 5, 2019, Conservationists filed this case in the U.S. District Court in

Idaho against the Forest Service and FWS, alleging the agencies violated the ESA

by failing to reinitiate consultation on the National Policy, and that the Forest

Service violated NEPA by failing to prepare a supplemental analysis of the

environmental effects of the Policy. *WildEarth Guardians et al. v. Forest Service

et al.*, No. 1:19-cv-00203-CWD (D. Idaho), ER-230 (Doc. 1). Federal Defendants

filed a motion to dismiss Conservationists' NEPA claim, ER-232 (Doc. 28), which

the District Court granted, ER-233 (Doc. 35). Then, after exchanging letters

seeking to rescind the BiOp, Federal Defendants filed a motion to dismiss the ESA

claim, ER-233 (Doc. 38). Conservationists in turn moved to file an amended and

supplemental complaint, ER-233 (Doc. 43). The District Court denied Federal

Defendants' second motion to dismiss and granted Conservationists leave to file an

amended and supplemental complaint, ER-234 (Doc. 55), in which

Conservationists alleged violations of the ESA and the Administrative Procedure

Act ("APA"). ER-234 (Doc. 56); ER-105. The District Court allowed the State of

Wyoming and the Idaho Fish and Game Commission to intervene as defendants,

and Safari Club International to participate as amicus curiae, ER-236 (Doc. 73).

The parties filed cross-motions for summary judgment, ER-237–38 (Docs. 93, 99, 100, 104). The District Court denied Conservationists' motion and granted the motions of Federal Defendants, the State of Wyoming, and the Idaho Fish and Game Commission, ER-005 (Doc. 118).

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's order on summary judgment. *Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1079 (9th Cir. 2015). When reviewing *de novo*, this Court views the case from the same position as the district court. *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004).

Because the ESA does not specify a standard of review, this Court applies the standard of review in the Administrative Procedure Act ("APA"). *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 923 (9th Cir. 2020). The APA provides the court shall "set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). Under the APA, the court's review is "narrow, but searching and careful." *Nat. Res. Def. Council v. Forest Service*, 421 F.3d 797, 806 n.20 (9th Cir. 2005).

## SUMMARY OF ARGUMENT

This appeal presents the issue whether "new information" exists that requires the Forest Service and FWS to reinitiate consultation as to effects on

grizzly bears of the National Policy, which the Forest Service adopted in 1995, that established a new "open-unless-closed" legal regime for the use of bait for hunting in national forests, ending the "closed-unless-open" regime that preceded it. The policy allows or prohibits baiting where states do but requires the Forest Service to continually monitor any baiting to ensure it does not conflict with federal interests, such as compliance with the ESA, and mandates federal action if a conflict arises that the agency cannot resolve with the state.

Before adopting the National Policy, the Forest Service consulted with FWS on the effects on grizzly bears of adopting the policy. The Forest Service found the policy is not likely to adversely affect grizzly bears. FWS concurred, deeming the killing of grizzlies at bait sites a "remote possibility." Both agencies limited their review to the use of bait to hunt in Wyoming, where at that time they may have perceived conflicts between grizzlies and baiting to be greatest.

Since then, there has been a significant increase in the numbers of grizzlies in two main ecosystems in Montana and Wyoming; marked expansion of grizzlies outside of recovery zones in those states; overlap between bait sites and where grizzlies may now be present; progress toward natural recolonization by grizzlies of the one ecosystem in Idaho that would boost recovery of the species in the lower 48 states; and instances of grizzlies being shot at black bear bait sites in between the ecosystems, in both Idaho and in Wyoming.

This Court should rule that agency "action" existed when the Forest Service adopted its National Policy and that new information requires the Forest Service and FWS to reinitiate consultation on the policy.

## ARGUMENT

### A.    The National Policy is "Agency Action" Under Section 7.

"Action" under Section 7 means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02. This Court has "repeatedly held that the ESA's use of the term 'agency action' is to be construed broadly." *Karuk Tribe*, 681 F.3d at 1021 (citations omitted). Under this broad definition, agency action is present "whenever an agency makes a discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Id*.

The National Policy is "agency action" because it constitutes a discretionary decision about whether and under what conditions to allow the use of bait in hunting on national forests. This is so because it (1) either "allows" or "prohibits" the use of bait in hunting in national forests depending on state law; (2) requires the Forest Service to monitor any baiting and to supervise response to the effects of baiting and to intervene if unresolved conflicts with Federal interests arise (including specifically conflicts with the ESA); and (3) ended a closed-unless-open

permitting regime and replaced it with a permissive open-unless-closed regime, authorizing the practice in places under conditions it was previously prohibited.

By its terms, the National Policy represents a discretionary decision about whether and under what conditions baiting may occur. The policy states baiting:

> [I]s prohibited on National Forest System lands where State hunting regulations prohibit its use. Where States permit the use of bait for attracting resident game, this activity is allowed on National Forest System lands, subject to State hunting laws and regulation.

*Use of Bait in Hunting*, 60 Fed. Reg. at 14,723. "Allow" and "prohibit" evince an affirmative, discretionary decision about whether to allow the private activity of baiting to proceed on national forests. *See Karuk Tribe*, 681 F.3d at 1026–27.[7]

Further, the National Policy does not simply defer the issue of baiting to states. In fact, in its EA evaluating the policy, the Forest Service considered—and rejected—a separate alternative, to "[r]ely only on State regulations to regulate baiting on NFS lands." ER-136 (Alternative 2). The Forest Service rejected that alternative because it "would not provide an opportunity for the Forest Service to take action when Federal interests need protection." ER-149. Instead, the Forest Service adopted the National Policy, which differs from Alternative 2 in several

---

[7]    *See* 'Allow,' '*Prohibit*,' *and* '*Prohibited*,' OXFORD AMERICAN DICTIONARY, Mobile App Version 15.7, *available at* https://apps.apple.com/us/app/oxford-dictionary/id978674211 (last accessed Sept. 26, 2023) (defining 'allow' as to "admit (an event or activity as legal or acceptable[,]" 'prohibit' as to "formally forbid (something) by law, rule, or other authority[,]" and 'prohibited' as "that has been forbidden; banned[.]").

important respects: the policy requires the Forest Service to "monitor State regulations" to ensure they "protect Federal interests;" to "prohibit or restrict the use of bait, in an area, by issuing a closure order," and provides the Forest Service "*must* close an area to baiting" if circumstances arise, including if "State laws and regulations conflict with Federal law, such as the Endangered Species Act." 60 Fed. Reg. at 14,721 (emphasis added). The policy thus manifests continued federal oversight, control, and a mandate to act if state laws and regulations related to baiting conflict with the ESA.[8]

The Forest Service's adoption of the National Policy as the proposed action in the EA itself amounts to agency "action" under Section 7 under this Court's reasoning in *Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 884 (9th Cir. 2022). There, federal agencies prepared an EA examining alternative approaches to offshore oil well stimulation treatments by private companies on the outer continental shelf, and selected an alternative that imposed no restrictions on

---

[8]   ESA regulations clarify that federal actions need only authorize private activity "in part" to be "agency action." 50 C.F.R. § 402.02; *Karuk Tribe*, 681 F.3d at 1023 ("[P]rivate activities can and do have more than one source of authority, and more than one source of restrictions on that authority."). While states may exercise concurrent jurisdiction, *see Use of Bait in Hunting*, 60 Fed. Reg. at 14,723, hunting in national forests is subject to the Forest Service's preemptive authority under the Property and Supremacy Clauses of the U.S. Constitution. *Kleppe v. New Mexico*, 426 U.S. 529, 540–41 (1976) ("the 'complete power' that Congress has over public lands necessarily includes the power to regulate and protect the wildlife living there.")

the activity. *Id*. at 865–66. This Court held that "by issuing the EA and FONSI for the proposed action of allowing well stimulation treatments offshore California, the agencies 'affirmatively authorized' private companies to proceed with these treatments[,]" necessitating Section 7 consultation. *Id*. at 884. That was so even though "the private companies would still need to obtain subsequent federal permits before conducting the challenged activity." *Id*. Similarly, here, by issuing the EA for its proposed action of allowing baiting where states allow the practice subject to federal oversight and intervention, the Forest Service affirmatively authorized hunters to proceed with the practice, notwithstanding the states' assertion of concurrent jurisdiction over the practice.

By contrast, no affirmative action exists under Section 7 where an agency merely "acquiesce[s]" to private activity that is proceeding pursuant to longstanding rights, without exercising any federal agency discretion. *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1103 (9th Cir. 2006). In *Matejko*, private landowners held perpetual rights-of-way on public lands allowing them to divert water from BLM-managed land for irrigation, under nineteenth-century statutes. *Id*. at 1103–04. This Court held the BLM did not affirmatively act because it was not "an entity responsible for the challenged decisionmaking." *Id*. at 1109. Unlike this case, the BLM did not adopt a policy on water diversions, nor mandate ongoing monitoring and supervision, nor define what conditions would trigger

federal intervention. *Compare id.* at 1103–09, *with* 60 Fed. Reg. at 14,722–23.

Here, the National Policy is an affirmative decision that may affect listed species,

as the Forest Service itself acknowledged by consulting with FWS under Section 7

in the first place. Moreover, in *Matejko*, BLM's authority to regulate the diversions

hinged on whether the landowners substantially deviated from their rights-of-way

in use or location. *Matejko*, 468 F.3d at 1110. Here, no private vested rights

interfere with the Forest Service's plenary authority to regulate bear baiting,

flowing as noted from the Property and Supremacy Clauses and affirmed by the

National Policy. *Use of Bait in Hunting*, 60 Fed. Reg. at 14,723.

Because the National Policy mandates that the Forest Service close an area

to baiting to protect ESA-listed species in the event of unresolved conflicts, this

too proves it is "action" under Section 7. ESA regulations include "actions

intended to conserve listed species or their habitat" among the examples of

"agency action." 50 C.F.R. § 402.02. The Decision Notice that implements the

policy states that precisely because the policy *requires* Forest Service intervention

in some circumstances, the policy "will have no effect on threatened or endangered

species." ER-147. The policy authorizes and charges Forest Service staff to

monitor any use of bait on national forests, determine whether state regulations are

adequate to protect federal interests (including the ESA), and close an area to

baiting if not. *Use of Bait in Hunting*, 60 Fed. Reg. at 14,723. The Forest Service

considered potential effects on grizzlies in preparing the policy and chose the policy in part after having determined, with the FWS's concurrence, that the policy was "not likely to adversely effect [*sic*] federally listed species," *i.e.*, grizzlies. ER-153.

The fact the Forest Service retains discretion in how it meets its ongoing duties under the National Policy does not make the policy any less agency action under Section 7. By way of comparison, forest plans too are steeped in agency discretion, setting out "a statement of priorities . . . [that] guides and constrains actions, but does not (at least in the usual case) prescribe them." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 71 (2004). And yet this Court has held that forest plans constitute agency action under Section 7 and require consultation because they establish criteria that guide future action. *See Envtl. Def. Ctr.*, 36 F.4th at 884–85 ("[W]e rejected the Forest Service's argument that the ESA did not apply to programmatic documents that themselves did not 'mandate any action' . . . concluding that these programmatic documents constituted agency action because they 'set forth criteria' that would influence future activities.") (citing *Cottonwood Envt'l L. Ctr. v. Forest Service*, 789 F.3d 1075, 1087 (9th Cir. 2015), *cert. denied*, 137 S.Ct. 293 (2016)). Here, the National Policy does more than *guide* future

agency action; it *mandates* future agency action in enumerated circumstances. *Use of Bait in Hunting*, 60 Fed. Reg. at 14,723.[9]

## B.     The Forest Service Retains Discretionary Involvement and Control.

Because the National Policy is agency action under Section 7, and therefore required consultation when it was adopted, the Forest Service must reinitiate consultation on the policy "where discretionary Federal involvement or control over the action has been retained or is authorized by law," and any one of four regulatory triggers is met. 50 C.F.R. § 402.16(a). Discretionary involvement or control exists where the agency has "the ability to implement measures that inure to the benefit of protected species." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995).

The Supreme Court has recognized that the Constitution gives Congress complete power over federal lands which "necessarily includes the power to regulate and protect the wildlife living there." *Kleppe*, 426 U.S. at 540–41 (discussing the Property Clause, U.S. CONST. ART. IV, sec. 3, cl. 2). And when Congress enacts legislation pursuant to its power over federal lands, "the federal

---

[9]    The second prong of the *Karuk Tribe* test for agency action—whether "the discretionary control retained by the federal agency . . . ha[s] the capacity to inure to the benefit of a protected species"—is also met. As noted, the Forest Service considered different alternatives under NEPA that would afford grizzlies varying degrees of protection, and had just prohibited baiting in Wyoming altogether for two hunting seasons, demonstrating its discretion to regulate the use of bait in national forests to benefit grizzlies.

legislation necessarily overrides conflicting state laws under the Supremacy Clause." *Id.* at 543 (citing U.S. CONST. ART. VI, cl. 2). Several statutes confirm Congress's intent that the Forest Service protect wildlife and endangered species in national forests. ER-129. For example, the Organic Act authorizes the Secretary of Agriculture to make rules and regulations regarding occupancy and use in national forests and to "preserve [them] from destruction." 16 U.S.C. § 551. The Multiple-Use Sustained-Yield Act of 1960 directs the Forest Service to administer national forests for multiple uses, including "recreation, range, timber, watershed, and *wildlife and fish purposes*." 16 U.S.C. § 528 (emphasis added). The National Forest Management Act directs the Forest Service to consider the "environmental aspects of various systems of renewable resource management . . . to provide for . . . wildlife" and to "provide for diversity of plant and animal communities" when promulgating regulations that guide development of land management plans. 16 U.S.C. §§ 1604(g)(3)(A)–(B). Finally, the ESA requires federal agencies to "seek to conserve endangered species and threatened species" and to utilize their authorities in furtherance of the ESA's purposes, which are to conserve listed species and their habitats. 16 U.S.C. §§ 1531(b)–(c)(1), 1536(a)(1).

The National Policy affirms the Forest Service's continued authority to exercise discretionary control over the use of bait in hunting bears in national forests is made explicit in the policy. The National Policy requires Forest Service

staff to "continually monitor State hunting regulations with regard to the use of bait" and to issue site-specific restrictions or prohibitions if State regulations are inadequate to protect federal resources, including if they threaten wildlife viability, or "conflict with Federal Law, such as the Endangered Species Act." 60 Fed. Reg. at 14,723. Therefore, the Forest Service retains authority to restrict or prohibit bear baiting in national forests to benefit grizzlies. *Cf., e.g., Wild Fish Conservancy v. EPA*, 331 F. Supp. 3d 1210, 1223–25 (W.D. Wash. 2018) (EPA retained discretionary involvement in approving state water quality regulations where it had authority to work with states to revise the regulations to conform with federal law, or to override state regulations entirely).

Moreover, the Forest Service retains "exclusive control" over its own internal policies and directives, and may modify the National Policy to be more protective of grizzlies if it so chooses. *See Cottonwood*, 789 F.3d at 1087. In the same way that forest plans provide the Forest Service continuing discretionary control over forest management projects, the policy provides the Forest Service continuing discretionary control over bear baiting in national forests. *Id.*

C.    New Information Exists that Was Not Previously Considered.

Where, as here, the action agency retains discretionary involvement or control over the action, agencies must reinitiate consultation "if new information

30

reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2).

First, the Forest Service and FWS have not considered effects of the National Policy on grizzly bears given their expanded range since the policy was adopted in 1995. By contrast, in 2017, FWS found that the GYE grizzly population had tripled its occupied range since 1975 and expanded into 92% of suitable habitat, up from 68% in the early 2000s. 82 Fed. Reg. 30,502, 30,502, 30,511. FWS data show that grizzly populations are expanding outside of the GYE and NCDE recovery zones and Demographic Monitoring Areas into other national forests, approaching the Bitterroot Ecosystem in Idaho. ER-71.

Courts have appropriately held that significant changes in populations of ESA-listed species constitute "new information" triggering the duty to reinitiate consultation. In *Friends of the Clearwater v. U.S. Forest Serv.*, No. 3:20-CV-00322-BLW, 2021 WL 3408595 (D. Idaho Aug. 4, 2021), the National Marine Fisheries Service wrote a BiOp concluding that a logging project in critical habitat for Snake River steelhead would not jeopardize the continued existence of the species, based on population data for a period that showed a return of over 45,000 individuals—a high point since the 1980s. *Id.* at *1–2. However, by the time NMFS issued the BiOp, more recent data from steelhead returns showed a decline to only 8,182 individuals. *Id.* at *6. The court held that the drop in steelhead

returns is "new information" requiring reinitiation of consultation, because the agencies had not considered that the project would have proportionally larger effects on the reduced population. *Id.* at *6–7. Here, similarly, grizzlies' expanded range into areas unoccupied when the National Policy was adopted in 1995 is "new information" requiring reinitiation of consultation, because this BiOp is based on data from the early 1990s, was limited to Wyoming, and did not and could not consider effects to grizzlies in areas of national forests that were then-unoccupied. The undisputed evidence of grizzlies' expanded range and recent mortalities show the National Policy is affecting grizzlies "to an extent not previously considered." 50 C.F.R. § 402.16(a)(2).

Second, although in 1993 FWS deemed it a "remote possibility" that grizzlies would be killed at bait stations, they have since been killed by hunters using bait in national forests in both Wyoming and in Idaho. As noted, grizzlies have been killed in both the Bridger-Teton National Forest in Wyoming, ER-106 ¶ 56 & ER-103 ¶ 56 and in the Nez Perce-Clearwater National Forest in Idaho. ER-106–07 ¶ 57 & ER-103 ¶ 57; ER-94 ¶ 57. Grizzlies have also been killed at bait stations at sites not clearly identified as to land ownership, ER-106 ¶ 50, ER-097 ¶ 1), (Rock Springs Canyon in Wyoming), or first identified as in a national forest, but then rescinded. ER-102 ¶¶ 49, 52. Grizzlies have also been observed at or near bait sites without having been shot. ER-066–69 (Nez Perce-Clearwater National

Forest in Idaho); ER-057–58, ¶¶ 15–17 (Caribou-Targhee National Forest in Idaho). Indeed, none of these mortalities or observances in Idaho has ever been part of consultation on the National Policy; they alone constitute new information revealing the National Policy may affect listed grizzlies in a manner or to an extent not previously considered. 50 C.F.R. § 402.16(a)(2).


Conclusion.

This Court should reverse on the merits, and remand to the district court for further proceedings.


Date: September 27, 2023.          Respectfully submitted,

                                   /s/ Sangye Ince-Johannsen
                                   SANGYE INCE-JOHANNSEN
                                   PETER M. K. FROST
                                   Western Environmental Law Center
                                   *Attorneys for Plaintiff-Appellants*

Certificate of Compliance.

I certify this brief contains 7,729 words, including 93 words manually counted in the visual image on page 9, and excluding the items exempted by FED. R. APP. P. 32(F). Accordingly, this brief complies with FED. R. APP. P. 32(a)(7)(B)(i).

/s/ Sangye Ince-Johannsen
SANGYE INCE-JOHANNSEN
PETER M. K. FROST
Western Environmental Law Center
*Attorneys for Plaintiff-Appellants*