No. 23-35352

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WILDEARTH GUARDIANS, et al.,
*Plaintiffs/Appellants*,

v.

UNITED STATES FOREST SERVICE, et al.,
*Defendants/Appellees*,

and

IDAHO FISH & GAME COMMISSION and STATE OF WYOMING
*Defendant-Intervenors/Appellees.*

Appeal from the United States District Court for the District of Idaho
No. 1:19-cv-203 (Hon. Candy W. Dale)

**FEDERAL APPELLEES' ANSWERING BRIEF**

TODD KIM
*Assistant Attorney General*

Of Counsel:                          ANDREW M. BERNIE
MELANIE PUGH                         ROBERT P. WILLIAMS
*Attorney*                           AMY E. COLLIER
Office of the General Counsel        *Attorneys*
U.S. Department of Agriculture       Environment and Natural Resources Division
                                     U.S. Department of Justice
RUTH HAMILTON HEESE                  Post Office Box 7415
LYDIA GRIMM                          Washington, D.C. 20044
*Attorneys*                          (202) 616-2625
U.S. Fish and Wildlife Service       amy.collier@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ..................................................................................... viii

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION........................................................3

STATEMENT OF THE ISSUES............................................................4

PERTINENT STATUTES AND REGULATIONS ..................................5

STATEMENT OF THE CASE...............................................................5

    A.      Statutory and Regulatory Background ...................................5

    B.      Factual Background........................................................8

          1.     Hunting with Bait on National Forest Lands ............................8

          2.     The Use of Bait in Wyoming Before 1993 .................................9

          3.     Region 2 Policy........................................................10

          4.     National Policy Statement on the Use of Bait in Hunting Resident Game .........................................12

          5.     *Fund for Animals* ....................................................17

          6.     Reinitiation Decision ................................................18

          7.     Closure Orders .......................................................20

    C.      Proceedings Below........................................................21

SUMMARY OF ARGUMENT .............................................................23

STANDARD OF REVIEW ..................................................................25

ARGUMENT ..................................................................................26

I.      Plaintiffs cannot show that reinitiation of consultation is
        required where the predicate underlying consultation has been
        withdrawn. ..........................................................................26

II.     The National Policy is not an "action" under ESA Section 7. .....................29

        A.      The National Policy does not authorize the use of bait in
                hunting. .....................................................................30

        B.      Plaintiffs' reasons for requiring consultation on the
                National Policy lack merit. ................................................36

        C.      The National Policy is readily distinguishable from
                examples of agency action cited by Plaintiffs. ...............................40

III.    Because the Forest Service had no duty to consult on the
        National Policy, it has no duty to reinitiate consultation. ...........................44

CONCLUSION ..............................................................................46

CERTIFICATE OF COMPLIANCE .....................................................48

ADDENDUM ...............................................................................49

# TABLE OF AUTHORITIES

## Cases

*Alaska Oil & Gas Ass'n v. Pritzker*,
    840 F.3d 671 (9th Cir. 2016) ..............................................................27

*Cal. Sportfishing Prot. All. v. FERC*,
    472 F.3d 593 (9th Cir. 2006) ............................................8, 32, 38

*Ctr. for Biological Diversity v. Env't Prot. Agency*, 847 F.3d 1075
    (9th Cir. 2017) ("*CBD v. EPA*") ............................................29, 38

*Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*,
    Civil Action No. 22-486 (BAH), 2023 WL 5035782
    (D.D.C. Aug. 8, 2023) ......................................................................29

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
    80 F.4th 943 (9th Cir. 2023) ("*CBD v. USFS*").....................31, 41

*Ctr. for Biological Diversity v. Zinke*,
    868 F.3d 1054 (9th Cir. 2017) ....................................................25, 26

*Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ....................................................25, 40

*Csutoras v. Paradise High Sch.*,
    12 F.4th 960 (9th Cir. 2021) ..........................................................25

*Defs. of Wildlife v. Andrus*,
    627 F.2d 1238 (D.C. Cir. 1980)......................................................31

*Defs. of Wildlife v. U.S. Env'l Prot. Agency*,
    420 F.3d 946 (9th Cir. 2005) ..........................................................34

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) ("*BOEM*")..................25, 30, 41, 42

*Friends of Animals v. Haaland*,
    997 F.3d 1010 (9th Cir. 2021) ........................................................25

iii

*Fund for Animals v. Thomas*,
127 F.3d 80 (D.C. Cir. 1997).............. 2, 11, 12, 17, 18, 19, 24, 27, 35, 39, 41

*Int'l Ctr. for Tech. Assessment v. Thompson*,
421 F. Supp. 2d 1 (D.D.C. 2006)..................................................35

*Karuk Tribe of Cal. v. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) (en banc) ................................7, 29, 30, 32, 43

*Kleppe v. New Mexico*,
426 U.S. 529, 545 (1976) ..............................................................31

*Lane County Audubon Society v. Jamison*,
958 F.2d 290 (9th Cir. 1992) ..................................................40, 41

*Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*,
551 U.S. 644 (2007)......................................................................27

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) ......................................................26

*Pac. Rivers Council v. Thomas*,
30 F.3d 1050 (9th Cir. 1994) ..................................................40, 41

*Sierra Club v. Babbitt*,
65 F.3d 1502 (9th Cir. 1995) ..................................................32, 36

*Utah Native Plant Soc'y v. U.S. Forest Serv.*,
923 F.3d 860 (10th Cir. 2019) ......................................................31

*W. Watersheds Project v. Matejko*,
468 F.3d 1099 (9th Cir. 2006).... 1, 3, 8, 19, 25, 27, 29, 33, 34, 35, 36, 38, 45

*W. Wood Preservers Inst. v. McHugh*,
925 F. Supp. 2d 63 (D.D.C. 2013)................................................27

*Westlands Water Dist. v. Dep't of the Interior*,
376 F.3d 853 (9th Cir. 2004) ........................................................26

*WildEarth Guardians v. U.S. Forest Serv.*, Case No. 1:19-cv-00203-
CWD, 2020 WL 2239975 (D. Idaho May 7, 2020) ......................22

*WildEarth Guardians v. U.S. Forest Serv.*, Case No. 1:19-cv-00203-
   CWD, 2020 WL 7647630 (D. Idaho Dec. 23, 2020) ....................................22

## Statutes and Court Rules

Administrative Procedure Act
   5 U.S.C. § 706(2)(A) .............................................................................23, 26

Endangered Species Act
   16 U.S.C. § 1532(19) ...........................................................................36
   16 U.S.C. § 1533(d) ...........................................................................36
   16 U.S.C. § 1536...............................................................................5
   16 U.S.C. § 1536(a)(2) ................................................1, 3, 5, 7, 27, 29
   16 U.S.C. § 1536(b) ...........................................................................6
   16 U.S.C. § 1536(b)(4) .........................................................................7
   16 U.S.C. § 1538(a)(1)(B) .................................................................7, 36
   16 U.S.C. § 1538(a)(1)(G) .....................................................................36
   16 U.S.C. § 1540(g)(1)(A) .......................................................................3
   16 U.S.C. § 1540(g)(1)(C) .....................................................................34

16 U.S.C. § 480 ....................................................................8, 13, 30

16 U.S.C. § 528 ....................................................................8, 13, 30

16 U.S.C. § 551 ..........................................................................20

16 U.S.C. § 7912 ..........................................................................9

28 U.S.C. § 1291 ..........................................................................4

28 U.S.C. § 1331 ..........................................................................3

28 U.S.C. § 2401(a) .....................................................................46

43 U.S.C. § 1732(b) .....................................................................31

Fed. R. App. P. 4(a)(1)(B) ...............................................................4

# Federal Regulations

36 C.F.R.
 § 216 ..................................................................................12
 § 241.2 ...........................................................................8, 31
 § 251.50(c) ...........................................................................9
 § 261.10(d) .........................................................................31
 § 261.50(a) .........................................................................20
 § 261.50(e) .........................................................................20
 § 261.58 .............................................................................20
 § 261.8 ................................................................................8

50 C.F.R.
 § 17.40(b) ..........................................................................36
 § 402.02 ....................................................................3, 7, 35
 § 402.13 .........................................................................5, 6
 § 402.13(c) .........................................................................16
 § 402.14 .........................................................................5, 6
 § 402.14(c) ....................................................................6, 27
 § 402.14(g) ..........................................................................6
 § 402.14(g)(4) .....................................................................27
 § 402.14(h) ..........................................................................6
 § 402.14(i) ............................................................................7
 § 402.16(a) .........................................................................44
 § 402.16(a)(1)-(4) .................................................................8
 § 402.16(a)(2) ...........................................................8, 44, 45

*Procedures for Involving the Public in Formulation of Forest Service Directives*, 49 Fed. Reg. 16,991 (Apr. 23, 1984) ...........................................13

*Use of Bait in Hunting*,
 59 Fed. Reg. 11,765-01 (Mar. 14, 1994) ..................................................10, 12

*Use of Bait in Hunting*,
 59 Fed. Reg. 17,758 (Apr. 14, 1994) ...........................................................12

*Use of Bait in Hunting*,
 60 Fed. Reg. 14,720 (Mar. 20, 1995) ........................ 9, 13, 14, 32, 34, 39, 41

## Other Authorities

Idaho Admin. Code 13.01.17.100 and 200 ............................................21

Mont. Code Ann. § 87-6-401 ..........................................................32

Rules, Wyo. Game & Fish Comm'n, ch. 3, § 3(e) ..................................21

U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv.,
    *ESA Section 7 Consultation Handbook*, *available at*
    https://www.fws.gov/sites/default/files/documents/endangered-
    species-consultation-handbook.pdf (last visited Nov. 27, 2023) ..................6

U.S. Forest Service, *Forest Service Directives*,
    *available at* https://www.fs.usda.gov/im/directives/
    (last visited Nov. 27, 2023) ..........................................................12

# GLOSSARY

APA                    Administrative Procedure Act

BE                     Biological Evaluation

BiOp                   Biological Opinion

EA                     Environmental Assessment

ESA                    Endangered Species Act

FWS                    United States Fish and Wildlife Service

ITS                    Incidental Take Statement

LOC                    Letter of Concurrence

NEPA                   National Environmental Policy Act

# INTRODUCTION

Section 7(a)(2) of the Endangered Species Act ("ESA") requires Federal agencies to consult with the appropriate wildlife service if an action they "authorize[], fund[], or carr[y] out" may affect a listed species or its critical habitat. 16 U.S.C. § 1536(a)(2). Section 7(a)(2)'s consultation obligation extends only to affirmative Federal agency action; it does not apply to an agency's inaction, *see, e.g.*, *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1107–08 (9th Cir. 2006) ("inaction is not action for section 7(a)(2) purposes" (quotation marks omitted)), or to the actions of state agencies.

In 1995, the United States Forest Service ("Forest Service") issued a policy statement to agency employees reaffirming its traditional deferral to individual states to determine whether hunters may use bait when hunting resident game on National Forest lands within their borders. This "National Policy" neither permits nor prohibits the use of bait in hunting. It simply leaves that decision to the states, consistent with longstanding principles of federalism recognizing that states have primary responsibility for regulating wildlife, except where the Federal government chooses to take action to preempt that authority. Today, eleven states allow the use of bait in black bear hunting, including Wyoming and Idaho.

The Forest Service informally consulted on the National Policy under ESA Section 7 with the United States Fish and Wildlife Service ("FWS"), which

concluded in 1995 that the Policy was not likely to adversely affect ESA-listed grizzly bears. In subsequent years, intervening Ninth Circuit case law confirmed that Section 7 applies only to "affirmative" agency action and not to "inaction." And the D.C. Circuit suggested that the National Policy in particular does not constitute agency action for ESA consultation purposes. *See Fund for Animals v. Thomas*, 127 F.3d 80 (D.C. Cir. 1997). Based on these developments and to clarify the Federal government's deferential role in the management of hunting practices, the Forest Service and FWS recently reviewed the National Policy consultation. In 2020, the Forest Service determined that the National Policy was not Section 7 agency action and therefore that neither consultation on the Policy in 1995 nor reinitiation of consultation were required. Based on those determinations, FWS agreed to withdraw the consultation documents.

In the district court, Plaintiffs directly challenged this 2020 decision. But they have dropped that direct challenge on appeal, and have not briefed any argument that the agencies erred in 2020 when they withdrew the consultation documents. Plaintiffs nevertheless argue on appeal that the National Policy does in fact constitute agency action under Section 7(a)(2) and that, as a result, the Forest Service must reinitiate the now-defunct consultation based on putatively new information about the effects on grizzly bears of hunting black bears with bait. Plaintiffs' indirect attack on the agencies' determination is at odds with the text of

2

the ESA, its implementing regulations, this Court's precedent, and the precedent of other courts.

As an initial matter, the Forest Service cannot be compelled to *reinitiate* consultation where, as here, the underlying consultation has been withdrawn. But even assuming that there was a consultation in place that could be reinitiated, the Forest Service cannot be compelled to consult on the National Policy because the National Policy does not "authorize[]" the use of bait in hunting within the meaning of ESA Section 7. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. State law determines whether and where the use of bait for hunting is authorized. The National Policy simply reaffirmed the Forest Service's deference to state law. Plaintiffs' real grievance is that the Forest Service has *not* acted to prohibit the use of bait in black bear hunting. But agency "inaction" does not create an ESA Section 7 duty to consult, *see Matejko*, 468 F.3d at 1107–08, nor can it create a duty to reinitiate consultation.

This Court should thus affirm the district court's grant of summary judgment to Appellees.

## STATEMENT OF JURISDICTION

(a)     The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the Endangered Species Act, 16 U.S.C. § 1540(g)(1)(A). ER-029; ER-227; ER-230.

3

(b)     The district court's judgment was final because it disposed of all claims against all defendants. ER-3–4. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)     Final judgment was entered on March 21, 2023. ER-4. Plaintiffs filed their notice of appeal on May 20, 2023, or 60 days later. ER-224; ER-240. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Where the Forest Service has determined that ESA Section 7 consultation was and is not required on the National Policy because the National Policy is not a Section 7 action, and FWS has accordingly withdrawn the consultation documents, can Plaintiffs compel the agencies to reinitiate consultation on the defunct and withdrawn consultation?

2.     Where the Forest Service has issued a National Policy statement to its employees that continues to defer to states' traditional regulatory authority to decide whether private individuals may use bait to hunt resident game on Forest Service lands within the state's borders, does the Forest Service authorize the use of bait to hunt black bears such that it is required to undertake ESA Section 7 consultation on the use of bait?

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Background

Section 7(a)(2) of the ESA requires each Federal agency to ensure that any action that it "authorize[s], fund[s], or carrie[s] out . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). To satisfy this obligation, the action agency—that is, an agency planning to undertake a covered action, for example, by issuing a permit or funding activities by others—must evaluate the potential effects of its proposed action on any listed species or designated critical habitat. If an agency concludes its proposed action "may affect" a listed species or its critical habitat, the agency must consult with the appropriate Service (the consulting agency), which for terrestrial species like grizzly bears is FWS. 50 C.F.R. §§ 402.13, 402.14; 16 U.S.C. § 1536.

The ESA's implementing regulations provide for two types of consultation. Informal consultation is an optional process comprising all discussions and correspondence between the consulting agency and action agency in order to determine whether formal consultation is necessary. 50 C.F.R. § 402.13. If the

action agency—with the written concurrence of the consulting agency—
determines that the action is not likely to adversely affect listed species or critical
habitat, consultation is terminated. *Id.* This is typically accomplished by a letter of
concurrence from the consulting agency to the action agency. By definition, a
finding of not likely to adversely affect means that the proposed action is not
expected to result in any take of listed species. *See* U.S. Fish & Wildlife Serv. &
Nat'l Marine Fisheries Serv., *ESA Section 7 Consultation Handbook*, at xv,
*available at* https://www.fws.gov/sites/default/files/documents/endangered-
species-consultation-handbook.pdf (last visited Nov. 27, 2023).

Conversely, if an action is likely to adversely affect listed species or critical
habitat, or if the issue is not resolved through informal consultation, "formal
consultation" must be undertaken. 50 C.F.R. § 402.14. The action agency must
request formal consultation and provide a description of the effects of the proposed
action and other information to the consulting agency. *Id.* § 402.14(c). Following
interagency consultation guidelines, the consulting agency then prepares a
biological opinion ("BiOp") that determines whether the action is likely to cause
"jeopardy" for a listed species or destroy or adversely modify its designated critical
habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g), (h).

A separate section of the ESA, Section 9, prohibits the "take" of any
endangered species of fish or wildlife except in compliance with the Act's terms.

16 U.S.C. § 1538(a)(1)(B). When FWS determines that Federal action is not likely to jeopardize a listed species' existence but will nevertheless result in take, FWS issues along with the BiOp an "incidental take statement" ("ITS") that exempts incidental take, in accordance with the terms and conditions of the ITS, from liability under Section 9. 16 U.S.C. § 1536(b)(4). The ITS identifies the amount and extent of take occurring incidental to the agency action, identifies reasonable and prudent measures to minimize the amount or impact of the incidental take, and proposes terms and conditions to implement the reasonable and prudent measures. *Id.*; 50 C.F.R. § 402.14(i).

The ESA Section 7 consultation requirements do not encompass all activities involving the Federal government—only "action[s] authorized, funded, or carried out" by a Federal agency that may affect listed species or designated critical habitat. 16 U.S.C. § 1536(a)(2). Examples of discretionary agency actions requiring consultation "include, but are not limited to:

> (a) actions intended to conserve listed species or their habitat;
> (b) the promulgation of regulations;
> (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or
> (d) actions directly or indirectly causing modifications to the land, water, or air."

50 C.F.R. § 402.02. This definition has been interpreted to apply only to "an 'affirmative' act or authorization." *Karuk Tribe of Cal. v. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (en banc). Accordingly, this Court has held that neither

inaction nor unexercised discretion is "action" within the meaning of the ESA. *See Matejko*, 468 F.3d at 1107-08; *Cal. Sportfishing Prot. All. v. FERC*, 472 F.3d 593, 595-98 (9th Cir. 2006).

Once consultation on an action has been completed, the action agency must reinitiate consultation where it retains "discretionary Federal involvement or control over the action" or Federal involvement or control is authorized by law and:

> (1) If the amount or extent of taking specified in the incidental take statement is exceeded;
> (2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
> (3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or
> (4) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16(a)(1)-(4).

## B. Factual Background

### 1. Hunting with Bait on National Forest Lands

Through Federal land management statutes, Congress has long acknowledged the States' traditional role in managing hunting practices for resident fish and game on National Forest lands. *See, e.g.*, 16 U.S.C. §§ 480, 528; *see also* 36 C.F.R. §§ 241.2, 261.8, & 251.50(c). The National Forests are generally open to recreational hunting, fishing, and shooting, consistent with

applicable state law. 16 U.S.C. § 7912. No special use permit is required for these noncommercial, recreational activities. *See* 36 C.F.R. § 251.50(c) (providing that "[a] special use authorization is not required for noncommercial . . . hunting").

"Baiting," when used in reference to the hunting of wildlife, means placing some form of attractant—generally items such as food, salt, or manufactured scents—in a particular location in an effort to attract the wildlife to the hunter. *See Use of Bait in Hunting*, 60 Fed. Reg. 14,720, 14,721 (Mar. 20, 1995). Consistent with states' general authority to regulate hunting on National Forest lands, National Forest managers have considered the hunting of animals with the use of bait to be a hunting practice that is "subject to State law and regulations." *Id.*

### 2. The Use of Bait in Wyoming Before 1993

Despite the Forest Service's regulation exempting hunting from special use authorization requirements, at various points in time prior to 1993, "some Forest Service units" required special use permits for the use of bait in hunting on National Forest lands. *See* 60 Fed. Reg. at 14,721. However, the Forest Service determined in 1992 that "the issuance of special use permits" for the use of bait on National Forest lands was "not appropriate" given its regulations. *See id.*; ER-146; ER-196. In March 1992, Region 2 of the Forest Service (which covers Colorado, Kansas, Nebraska, and most of South Dakota and Wyoming) issued a closure order prohibiting the use of bait for black bear hunting in Wyoming unless it was

conducted in compliance with certain conditions, which generally tracked the conditions in the prior special use permits. *Use of Bait in Hunting*, Forest Service, 59 Fed. Reg. 11,765-01, 11,766 (Mar. 14, 1994); SER-139. A group of plaintiffs challenged this closure order, asserting that this constituted a shift in established policy. *Id.*; *see also Fund for Animals v. Robertson*, Case No. 1:92-CV-01694 (D.D.C. dismissed Nov. 30, 1992). The parties settled the case upon the Forest Service's agreement to complete an environmental assessment ("EA") under the National Environmental Policy Act ("NEPA") that considered options for regulating the use of bait on National Forest lands in Wyoming and to initiate formal consultation with FWS. *See* 59 Fed. Reg. at 11,765-01, 11,766.

### 3.    Region 2 Policy

Following the settlement in *Robertson*, the Forest Service developed the "Region 2 Policy," which applied to the use of bait on National Forests only in Wyoming. ER-168–80. Through this policy, the Forest Service proposed to use a "Memorandum of Understanding" with the Wyoming Game and Fish Commission to regulate "noncommercial bear baiting on National Forest System lands" in Wyoming "through State Game Regulations and close all designated Wilderness to bear baiting." ER-182; ER-168.

In accordance with the settlement, the Forest Service prepared an EA and completed formal ESA consultation with FWS. ER-193–223; ER-158–67; SER-

87–88. That consultation culminated in FWS's issuance of a BiOp ("Region 2 BiOp") in April 1993, which concluded that the proposed Region 2 Policy was not likely to jeopardize the continued existence of the grizzly bear or destroy or adversely modify its designated critical habitat. ER-158–67. The Region 2 BiOp contained non-discretionary conditions to avert the "remote possibility that a grizzly bear may be taken as a result of black bear baiting," as well as some discretionary conservation recommendations. *See* ER-164–65; *Fund for Animals*, 127 F.3d at 82. These measures were to be in place "until such time as they become State Regulations." ER-182; *see also* ER-169. FWS did not anticipate any incidental take of grizzly bears, and therefore issued an ITS that did not exempt any take. ER-164. Wyoming subsequently adopted regulations that mirror the mitigation measures contemplated by the BiOp. *See* SER-59; SER-60.

Ultimately, the Region 2 Policy was never implemented. *See Fund for Animals*, 127 F.3d at 82. The Forest Service withdrew it in July 1993—three months after issuing it—to replace it with a new national policy.[1] ER-157; ER-146–47.

---

[1] Plaintiffs provide significant background on the Region 2 Policy and its accompanying documents. Opening Br. 10–13. However, as they acknowledge, the Region 2 Policy and EA were rescinded in 1993, rendering those actions immaterial here. *See id.* at 13.

11

As the Forest Service drafted a national policy statement, it temporarily closed National Forest lands in Wyoming to hunting black bears with bait. ER-157; *Fund for Animals*, 127 F.3d at 82. In March 1994, the Forest Service published an interim policy, which recognized that National Forest lands are generally open to hunting and that hunting practices, such as the use of bait, are generally regulated by states. *See Use of Bait in Hunting*, 59 Fed. Reg. 11,765 (Mar. 14, 1994). However, this interim policy was challenged in court, and as part of an agreement to stay the proceedings, the Forest Service agreed to withdraw it and reissue a proposed national policy. SER-128. In the meantime, the Forest Service closed National Forest lands in Wyoming to bear baiting and left the practice to state regulation elsewhere. *See* SER-128; *Use of Bait in Hunting*, 59 Fed. Reg. 17,758 (Apr. 14, 1994) (soliciting public comment on a proposed national policy that generally tracked the interim policy).

### 4. National Policy Statement on the Use of Bait in Hunting Resident Game

In March 1995, the Forest Service issued the National Policy statement "to Agency employees as an amendment to the Forest Service Manual 2640."[2] *Use of*

---

[2] The Forest Service Manual is part of the Forest Service Directive System, which serves as the primary source of administrative direction to Forest Service employees. *See* U.S. Forest Service, *Forest Service Directives*, *available at* https://www.fs.usda.gov/im/directives/ (last visited Nov. 27, 2023). Some new or modified Manual entries require Federal Register notices, *see* 36 C.F.R. § 216, which is why this Manual update was noticed in the Federal Register, *see* 59 Fed.

*Bait in Hunting*, 60 Fed. Reg. 14,720 (Mar. 20, 1995). The notice explained that "[t]he intended effect of the final policy is to clarify the Agency's role with regard to baiting in relation to the role of the States and, thus, to provide a consistent approach to the regulation of baiting resident game on National Forest System lands." *Id.* Unlike the Region 2 Policy, which applied only in Wyoming and only to black bear hunting, the National Policy applies to National Forest lands in all states and to "resident game" hunting more broadly. *Id.*; ER-147.

The National Policy statement acknowledged longstanding principles of deferring to state regulation of hunting practices, 60 Fed. Reg. at 14,721, and "reaffirm[ed] that regulation of baiting is a State responsibility," ER-147. The Forest Service identified numerous Federal statutes that recognize "the States' traditional role in managing" hunting and explained that the practice of placing bait "is a hunting activity subject to State law and regulations." 60 Fed. Reg. at 14,721 (citing, for example, 16 U.S.C. §§ 480, 528). In line with these principles, the National Policy statement provides that the use of bait "is prohibited on National Forest System lands where State hunting regulations prohibit its use." *Id.* at 14,723. And "[w]here States permit the use of bait," "this activity is allowed on National Forest System lands, subject to State hunting laws and regulation, unless

---

Reg. 17,758 (Apr. 14, 1994)); *Procedures for Involving the Public in Formulation of Forest Service Directives*, 49 Fed. Reg. 16,991, 16,993 (Apr. 23, 1984) (setting forth notice requirement at the time).

the authorized [Forest Service] officer determines on a site-specific basis that there

is a need to prohibit or restrict the practice." *Id.*

The Forest Service consistently made clear that the National Policy was "not

intended to determine whether or not the practice of using bait in hunting is to be

allowed on National Forest System lands," since it left that decision to each state.

*Id.* at 14,721. Thus, the Policy does not require any Forest Service officer "to

undertake a specific decision to allow baiting on National Forest System lands in

those States where the practice is permitted." *Id.* at 14,723. The Forest Service

explained that "[t]he final policy . . . provides for Federal action if State regulations

do not protect Federal interests." *Id.* at 14,720–21 (stating that if state law conflicts

with Federal law, the Forest Service "would first consult with the State . . . to see if

the conflict could be resolved" and then "could prohibit or restrict use of bait, in an

area, by issuing a closure order"). But "[i]f State regulations are adequate to protect

grizzly bears or any other threatened or endangered species, no action is needed by

the Forest Service." *Id.* at 14,722.

The Forest Service prepared a biological evaluation ("National Policy BE")

for the National Policy, in which it explained that the "policy is an administrative

action which will not directly affect any listed or proposed species." SER-77. The

National Policy BE stated that the Policy would "programatically [sic] benefit (<u>is

not likely to adversely affect</u>) the bald eagle, gray wolf and grizzly bear on

[National Forest] lands (excluding Wyoming)." SER-78. The National Policy BE

noted that the biological evaluation previously prepared for the Region 2 Policy

concluded that bear baiting on National Forest lands in Wyoming "may affect" the

grizzly bear, SER-78, though it also noted the ultimate "no jeopardy" finding for

the grizzly bear in the Region 2 BiOp, SER-78.

The Forest Service requested FWS review the National Policy BE and

conveyed its view that the National Policy "would not change the conditions or

situations that were present when the [Region 2 BiOp] was issued." ER-156. The

FWS Field Supervisor in Wyoming responded by letter on February 27, 1995, that

the anticipated effects of the "proposed National Policy appear[] to be consistent

with" those of the Region 2 Policy, as evaluated by the Region 2 BiOp, and that

"no information has become available to suggest that additional terms and

conditions are necessary at this time." ER-155. In a separate letter of concurrence

on March 14, 1995, the Assistant Director for Ecological Services at FWS

"concur[red] in [the Forest Service's] determination that the proposed national

policy on baiting is not likely to adversely affect federally listed species"

("National Policy LOC"). ER-153. This second letter concluded informal ESA

Section 7 consultation on the National Policy. It did not incorporate or even

mention the Region 2 BiOp.[3] *Id.* Because the informal consultation concluded that the National Policy was not likely to adversely affect any listed species, including grizzly bears, the National Policy's consultation process properly terminated without a BiOp or ITS. *See* 50 C.F.R. § 402.13(c).

The Forest Service prepared an EA under NEPA for the National Policy, concluding that the environmental consequences of the Policy "would be negligible." SER-95; *see also* ER-146–49 (Forest Service Decision Notice and Finding of No Significant Impact, concluding that the National Policy is not a major Federal action and "will not significantly affect the quality of the human environment"). In the Decision Notice, the Forest Service reiterated that it was "continu[ing] its long-standing policy of recognizing the States as the proper agencies to administer baiting on [National Forest] lands," described any change from the Policy as "administrative," and concluded that issuance of the Policy statement would "have no effect on threatened or endangered species." ER-146; ER-148.

---

[3]    Nor could the National Policy LOC permissibly incorporate the Region 2 BiOp. The standards for completing informal consultation (not likely to adversely affect) and formal consultation (likely to adversely affect) are fundamentally incompatible with one another.

### 5. *Fund for Animals*

A group of plaintiffs brought a challenge shortly after the National Policy statement was issued. *See Fund for Animals*, 127 F.3d at 82–83. They argued that the Forest Service (1) had violated NEPA by failing to prepare an environmental impact statement evaluating the National Policy, *id.*; and (2) was required to consult formally on the National Policy with FWS under ESA Section 7 and obtain a BiOp and ITS, *id.* at 84.

The D.C. Circuit rejected both challenges. On NEPA, the court held that the National Policy was not a "major Federal action" within the meaning of that statute and thus did not require an environmental impact statement. *Id.* at 83. Importantly, the court noted that the National Policy might "not constitute 'action' at all," "because it implements the existing federal policy of leaving baiting regulation to individual states that have adopted adequate regulatory provisions." *Id.* at 83 and n.3. The court framed the Forest Service's decision as "refrain[ing] from future regulation of baiting," *id.* at 83 n.3, and explained that that the National Policy "maintained the substantive *status quo*," *id.* at 84. The court also observed that, "since 1988 the Forest Service has regulated baiting in only three of the nine states in which baiting remains lawful—Idaho, Utah and Wyoming," and that since 1993, the use of bait in Idaho and Utah had "been subject to state, not federal,

17

regulation," meaning the Policy "had no effect outside Wyoming."[4] *Id.* at 83. And even in Wyoming, the effect was "minimal" because Wyoming's regulations closely tracked the Federal regulations they replaced. *Id.*

As for the ESA, the court reiterated its doubt that the National Policy was "action" that required consultation at all. *See id.* at 84 & n.6 ("If promulgation of the policy constituted 'inaction,' there most probably would have been no 'agency action' to trigger the ESA consultation requirement." (citing *id.* at 83 n.3)). In any event, "[t]o the extent that there was an ESA consultation obligation," the court held that the "Forest Service and FWS fulfilled it by engaging in 'informal consultation' in February and March 1995." *Id.* The Forest Service was not required to complete formal consultation.

### 6.    Reinitiation Decision

After Plaintiffs filed their complaint in this case, the Forest Service and FWS considered whether reinitiation of the National Policy consultation was required. In June 2020, the Forest Service determined that the National Policy—and the short-lived Region 2 Policy—were not Federal actions within the meaning of ESA Section 7, and both agencies agreed that it was therefore appropriate to withdraw the 1993 Region 2 BiOp, Region 2 ITS, and National Policy LOC. SER-44–49.

---

[4]    Today, eleven states allow the use of bait for black bear hunting in at least some areas. SER-53.

The Forest Service noted that the 1993 Region 2 BiOp and ITS were prepared for the defunct Region 2 Policy, which was never implemented. SER-47. More broadly, the Forest Service explained that the agency's "policy statements reinforcing the longstanding Forest Service practice of deferring to States to regulate hunting and hunting practices on [National Forest] lands were never, in fact, Agency actions that triggered the consultation requirement of the ESA," adding that they "do not affirmatively authorize, fund, or carry out any activity." SER-47. The Forest Service pointed to two decisions that post-dated the adoption of the National Policy. First, the Forest Service noted the D.C. Circuit's assessment in *Fund for Animals* that no consultation would be required if the National Policy constituted inaction. SER-47. Then, the Forest Service likened the Policy to the "inaction" in this Court's 2006 decision in *Matejko*, emphasizing that an agency's decision not to exercise its regulating authority, without affirmative action, does not trigger a duty to consult under ESA Section 7. SER-48. The Forest Service explained that leaving a voluntary consultation on the National Policy in place would create—and has created—confusion about the Federal role in the management of hunting practices. SER-48. Based on this determination and the fact that the Region 2 Policy was never implemented, the Forest Service requested that FWS withdraw the 1993 Region 2 BiOp and its associated ITS, as well as the 1995 National Policy LOC. SER-47.

19

FWS concurred that withdrawal of the consultation documents was appropriate. SER-44–45. FWS also noted that, because the 1993 and 1995 consultation documents are without effect and withdrawn, there is no underlying consultation on which to reinitiate. SER-44–45. And because it was not aware of any discretionary, affirmative Forest Service action, FWS independently concluded that there was no basis for it to request reinitiation of consultation. SER-44–45.

### 7. Closure Orders

Pursuant to statutory and regulatory authority separate and apart from the National Policy, the Forest Service may issue orders that close or restrict the use of certain areas on National Forest lands. *See* 16 U.S.C. § 551; 36 C.F.R. § 261.50(a). Such orders may exempt certain users. *See* 36 C.F.R. § 261.50(e). Forest Supervisors also may issue orders regulating the occupancy or use of National Forest lands, including the possession of food. *Id.* § 261.58.

Currently, the National Forests in Wyoming and Idaho where grizzly bears are present have no closure orders prohibiting bear baiting.[5] Both Wyoming and

---

[5]    Before the National Policy was adopted, the Forest Service had issued a special order prohibiting bear baiting in certain National Forest lands within Wyoming, including grizzly bear recovery zones. SER-133. This order was rescinded when the National Policy was adopted. SER-67; SER-73. A subsequent closure order was issued in 1995 in Wyoming, but this order was withdrawn in 1998 when Wyoming promulgated regulations that encompassed all of the requirements set forth in the order, SER-69; SER-60; SER-59. Plaintiffs have not challenged the issuance or withdrawal of any closure order in this lawsuit.

Idaho regulate the placement and types of baits used in hunting, and both require hunters either to register bait sites with the state or to obtain a permit from the state to place bait. *See* Rules, Wyo. Game & Fish Comm'n, ch. 3, § 3(e); Idaho Admin. Code 13.01.17.100 and 200. Both states also restrict the use of bait in certain federally designated grizzly bear recovery areas.

Food storage orders are in place on some National Forest lands within Idaho and Wyoming that are occupied by grizzly bears. *See, e.g.*, ER-111–23. Such orders are not considered "closure orders," nor are they used or intended to regulate hunting practices. Instead, they are issued to protect the public and minimize conflicts between grizzly bears and humans unrelated to hunting. *See, e.g.*, SER-57 (explaining that the "major emphasis of the Order is to protect public safety by reducing incidents of public contact with food habituated bears"). Because food storage orders are not intended to regulate the placement of bait but could otherwise be interpreted as prohibiting this activity, many specify the orders do not extend to "[p]ersons in the act of placing black bear baits for the lawful purpose of hunting black bears under state law and regulation." *See, e.g.*, ER-111; ER-122.

### C.    Proceedings Below

On June 5, 2019, Plaintiffs filed a complaint against the Forest Service and FWS, alleging that the Forest Service is required to complete supplemental

analysis of the National Policy under NEPA and that both agencies must reinitiate consultation under the ESA. The district court dismissed the NEPA claim because there is "no ongoing or proposed federal action that requires supplementation." *See WildEarth Guardians v. U.S. Forest Serv.*, Case No. 1:19-cv-00203-CWD, 2020 WL 2239975, at *7 (D. Idaho May 7, 2020). Plaintiffs do not appeal this ruling.

After the Forest Service concluded that there was no affirmative action on which to consult and FWS accordingly withdrew the Region 2 BiOp and ITS and the National Policy LOC, the Federal Defendants filed a second motion to dismiss, arguing that Plaintiffs' ESA claim was moot because the underlying consultations are inoperative and cannot be reinitiated. The district court denied the motion and granted Plaintiffs' motion to amend their complaint. *WildEarth Guardians v. U.S. Forest Serv.*, Case No. 1:19-cv-00203-CWD, 2020 WL 7647630, at *9–10 (D. Idaho Dec. 23, 2020); ER-232–33. In their amended complaint, Plaintiffs alleged that the Forest Service and FWS "violated the ESA by rescinding the Biological Opinion without complying with procedural requirements." SER-43.

The district court subsequently permitted the State of Wyoming and the Idaho Fish and Game Commission to intervene as defendants. ER-235. The parties filed cross-motions for summary judgment, and after a hearing, the district court denied Plaintiffs' motion for summary judgment and granted the summary judgment motions of the Federal Defendants and Intervenor-Defendants.

The district court held that the Forest Service's issuance of the 1995 National Policy did "not constitute 'agency action' within the meaning of the ESA." ER-042. The district court also rejected Plaintiffs' argument that the Forest Service was required to reinitiate consultation, concluding that Plaintiffs failed to "show[] that the Forest Service is engaged in 'ongoing agency action' pursuant to the 1995 National Policy." ER-048. Finally, the district court "decline[d] to address whether the withdrawal of the 1993 BiOp, its associated ITS, and the 1995 LOC violated" 5 U.S.C. § 706(2)(A). ER-049. On appeal, Plaintiffs challenge the district court's conclusion that the 1995 National Policy is not agency action and that the Forest Service was not required to reinitiate the withdrawn consultation, but they do not renew their arguments that the agencies erred in withdrawing the consultation in the first place.

## SUMMARY OF ARGUMENT

The Forest Service's National Policy of deferring to state law on whether hunting with bait is allowed or prohibited on National Forest lands is not an agency "action" under ESA Section 7(a)(2). Rather, it is merely Federal *inaction*, which cannot trigger a duty to consult under Section 7.

At the outset, the Forest Service determined in 2020 that the National Policy was not an ESA Section 7(a)(2) action, and it appropriately requested that FWS withdraw the National Policy LOC. Plaintiffs do not directly challenge this

23

determination or the withdrawal of the National Policy LOC, and they cannot show

that consultation must be "reinitiated" in the absence of an existing consultation or

proposed agency action.

In any event, there is no duty to reinitiate consultation or to consult in the

first place, because the National Policy is not an agency action under Section

7(a)(2). Plaintiffs argue that the National Policy is agency action because it is "a

discretionary decision about whether and under what conditions to allow the use of

bait in hunting on national forests." Opening Br. at 22. But as Plaintiffs repeatedly

acknowledge, states—not the Forest Service—determine whether hunting with bait

is authorized within their borders. States issue hunting licenses and administer

baiting programs. States thus determine whether, and under what conditions, to

"authorize" the use of bear bait, and individual hunters carry out the practice where

states permit it. By issuing the National Policy statement to its employees, the

Forest Service simply reaffirmed this traditional deference to state law and

"maintained the substantive *status quo*," as another Court of Appeals has already

recognized. *See Fund for Animals*, 127 F.3d at 84. The Forest Service's monitoring

of state regulations does not transform its inaction into Section 7 action.

Moreover, the National Policy is readily distinguishable from cases where a

Federal agency has authorized an action that may affect a listed species or critical

habitat. The National Policy does not "set specific guidelines and standards" for

24

permitting future actions, as forest plans do. *See Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1078 (9th Cir. 2015). It does not determine what activities will be permitted on leases issued by a Federal agency. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 884 (9th Cir. 2022) ("*BOEM*"). Nor does it "issue permits," "grant contracts," "build dams," or "divert streams." *Matejko*, 468 F.3d at 1109 (emphasis deleted). It defers to states to determine whether to authorize the use of bait for hunting within their jurisdictions.

Because the use of bait in black bear hunting is not Federally authorized, funded, or carried out, it cannot constitute a Federal agency action under Section 7. And where there is no such agency action, there is no duty to consult or reinitiate consultation.

## STANDARD OF REVIEW

This Court reviews de novo a district court's decision on cross motions for summary judgment. *Csutoras v. Paradise High Sch.*, 12 F.4th 960, 965 (9th Cir. 2021).

The Court reviews Plaintiffs' ESA challenge pursuant to the Administrative Procedure Act ("APA"). *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir. 2017). Under the APA's "deferential and narrow" standard of review, *Friends of Animals v. Haaland*, 997 F.3d 1010, 1015 (9th Cir. 2021), an agency action will be upheld unless "it is 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law,'" *Westlands Water Dist. v. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). "A court cannot substitute its judgment for that of the agency." *Zinke*, 868 F.3d at 1057. The only question before the Court "is whether the [Federal Defendants], in reaching [their] ultimate finding, considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (quoting *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir. 2007)).

## ARGUMENT

Plaintiffs assert that the Forest Service and FWS are required to reinitiate consultation on the effects of the National Policy on grizzly bears. Opening Br. at 20–21. But—in addition to the fact that there is no longer any existing consultation to "reinitiate"—the National Policy is not an "action" within the meaning of Section 7, so the Forest Service has no duty under Section 7 to consult in the first instance or to reinitiate consultation. Plaintiffs cannot use purported "new information" to compel reinitiation of consultation where there is no consultation duty.

## I. Plaintiffs cannot show that reinitiation of consultation is required where the predicate underlying consultation has been withdrawn.

As discussed above, the Forest Service and FWS appropriately withdrew the 1993 Region 2 BiOp, its associated ITS, and the 1995 National Policy LOC in June

2020. *See* SER-48–50; SER-44–45. The Federal Defendants were not required to leave in place a consultation for the Region 2 Policy, which never went into effect and never will, because a BiOp is prepared for a specific action.[6] And they were "fully entitled" to "change[] their minds" about whether the National Policy is a Federal action requiring Section 7 consultation. *See Nat'l Ass'n of Homebuilders v. Defs. of Wildlife*, 551 U.S. 644, 658–59 (2007). The Forest Service acknowledged that it was changing its position and provided a reasonable explanation for why consultation and reinitiation are not required under the facts and the law as they exist today. *See id.*; SER-47–48 (citing *Fund for Animals*, 127 F.3d at 80, and *Matejko*, 468 F.3d at 1108); *accord Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681–82 (9th Cir. 2016).

On appeal, Plaintiffs have abandoned their claim that the withdrawal was unlawful, and they do not raise the validity of the withdrawal as an issue for this

---

[6]     ESA consultation is specific to the agency action that is proposed, and a BiOp analyzes the effects of that particular action. 16 US.C. § 1536(a)(2); 50 C.F.R. § 402.14(c); *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 77 (D.D.C. 2013) (FWS "is instructed only to determine 'whether *the action*, taken together with cumulative effects, is likely to jeopardize' endangered species" (quoting 50 C.F.R. § 402.14(g)(4)). The proposed action analyzed in the Region 2 BiOp and the action granted exemption from take liability in the Region 2 ITS was the Region 2 Policy, not the National Policy. *See Fund for Animals*, 127 F.3d at 83–84 (confirming that the National Policy did not require a BiOp and ITS and, implicitly, that the National Policy was never covered by the Region 2 BiOp and ITS; if the Region 2 BiOp and ITS had covered the National Policy, there would have been no need to determine whether formal consultation—a BiOp—was required for the National Policy).

Court to decide.[7] But the withdrawal of the underlying consultations creates a threshold defect in Plaintiffs' case. Plaintiffs claim reinitiation is required because the level of take anticipated in the Region 2 ITS has been exceeded, *see* Opening Br. at 32 (citing FWS's determination in the Region 2 ITS that it was a "remote possibility" that grizzly bears would be killed at bait stations), and because there is new information that reveals effects not considered in the Region 2 BiOp, *see id.* at 32–33. But the Region 2 BiOp and ITS were withdrawn because they were prepared for the Region 2 Policy, which was never implemented. Those consultation documents were legally distinct from the National Policy, which underwent a separate, informal consultation. And the Forest Service reasonably determined that the National Policy LOC should be withdrawn as well because the National Policy is not a Federal agency action under Section 7. Plaintiffs have not explained how the Forest Service can have an ESA Section 7 duty to reinitiate consultation where the predicate underlying consultation was withdrawn and Plaintiffs do not challenge the withdrawal.[8] Plaintiffs' failure to challenge the

---

[7]    Plaintiffs appear to suggest, fleetingly, that these consultation documents were somehow not withdrawn, but they do not make that point affirmatively or squarely address the agencies' decisions or their implications. *See* Opening Br. at 19 (stating that the Federal Defendants "exchang[ed] letters seeking to rescind the BiOp").

[8]    On factually distinct grounds, a district court recently concluded that plaintiffs sufficiently stated a claim to defeat a motion to dismiss where they argued a Federal agency was required to reinitiate consultation in the absence of an

withdrawal is by itself fatal to the claim that consultation should be reinitiated—there is no consultation to reinitiate.

## II.    The National Policy is not an "action" under ESA Section 7.

Even if there was an existing consultation to reinitiate consultation on, the Forest Service has no duty to reinitiate consultation on the National Policy—and had no duty to consult in the first instance—because the National Policy is not an ESA Section 7 action. The ESA Section 7 consultation duty arises only where a Federal agency "authorize[s], fund[s], or carrie[s] out" an action. 16 U.S.C. § 1536(a)(2). Although "the ESA's use of the term 'agency action' is to be construed broadly," this Court has been clear that consultation is required "only when [the agency] makes an 'affirmative' act or authorization." *Karuk Tribe*, 681 F.3d at 1021. In other words, "'inaction' is not 'action' for section 7(a)(2) purposes." *Matejko*, 468 F.3d at 1107–08; *see also Ctr. for Biological Diversity v. Env't Prot. Agency*, 847 F.3d 1075, 1090 (9th Cir. 2017) ("*CBD v. EPA*") ("[A]n ESA claim accrues only when an agency takes discretionary, affirmative action.").

---

initial final consultation. *See Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, Civil Action No. 22-486 (BAH), 2023 WL 5035782 (D.D.C. Aug. 8, 2023). The Federal Defendants believe this ruling was incorrect. Nevertheless, there, the Federal agency had not requested withdrawal of consultation documents after determining that there was no Section 7 action; instead, the court explained, "consultation was initiated three times . . . and was simply abandoned thereafter." *Id.* at *10 n.5.

This Court "use[s] a two-step test to determine whether an action qualifies as a sufficient 'agency action' under the ESA." *BOEM*, 36 F.4th at 884. "First, relying on the text of the statute," this Court "consider[s] whether an agency 'affirmatively authorized, funded, or carried out the underlying activity.'" *Id.* (quoting *Karuk Tribe*, 681 F.3d at 1021). "If this standard is met, [the Court] next determine[s] whether the action was discretionary, in this context meaning that the agency had 'some discretion to influence or change the activity for the benefit of a protected species.'" *Id.* (quoting *Karuk Tribe*, 681 F.3d at 1021).

Here, Plaintiffs fail at the first step: they fail to show that the Forest Service authorizes the underlying activity—the use of bait in hunting on National Forest lands.[9]

## A. The National Policy does not authorize the use of bait in hunting.

Congress and Federal agencies have repeatedly recognized states' role in regulating hunting practices within their borders. *See, e.g.*, 16 U.S.C. § 480 (Forest Service Organic Act, which provides that state civil and criminal jurisdiction extends to National Forest lands within their borders); *id.* § 528 (providing that

---

[9]     Plaintiffs have not argued that the National Policy "funds" the use of bait, or that the Forest Service itself "carries out" hunting with bait by engaging in the practice itself. Therefore, the question before this Court turns on whether the National Policy "authorizes" hunting resident game with bait. For the reasons explained below, it does not.

"[n]othing herein shall be construed as affecting the jurisdiction or responsibilities of the several States with respect to wildlife and fish on the national forests"). "Traditionally, 'states have broad trustee and police powers over wild animals within their jurisdictions' to the extent that state management is 'not incompatible with, or restrained by, the rights conveyed to the federal government by the constitution.'" *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 80 F.4th 943, 947 (9th Cir. 2023) ("*CBD v. USFS*") (quoting *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976)). As a result, even though the Forest Service "has broad regulatory authority that allows it to regulate hunting and fishing activities," the Forest Service "rarely exercises its authority to preempt state laws related to hunting and fishing." *Id.* at 947–48 (citing 43 U.S.C. § 1732(b); 36 C.F.R. §§ 241.2, 261.10(d)); *see also Utah Native Plant Soc'y v. U.S. Forest Serv.*, 923 F.3d 860, 870 (10th Cir. 2019) (recognizing "Congress's determination, and the [Forest Service's] obvious recognition in this case, that [Utah] retains a measure of sovereignty over wildlife management within the national forest"); *Defs. of Wildlife v. Andrus*, 627 F.2d 1238, 1248 (D.C. Cir. 1980) ("Despite its ability to take control into its own hands, Congress has traditionally allotted the authority to manage wildlife to the States.").

Accordingly, under the National Policy, states decide whether or not to allow hunters to use bait. Both before and after the Forest Service issued the

National Policy statement, some states—such as Idaho and Wyoming—have chosen to permit the practice, while others—such as Montana—have prohibited it. *See* ER-200–01; SER-53; Mont. Code Ann. § 87-6-401. The National Policy did nothing to upset that historical scheme. Instead, it maintained the long-standing deference to state authority. *See* ER-146–47 (explaining that the National Policy was intended to clarify the Forest Service's role and reaffirm the "long-standing policy" that "regulation of baiting is a State responsibility"); 60 Fed. Reg. at 14,722 ("The policy retains the long-standing reliance on State regulation of baiting resident game.").

Consequently, a hunter's use of bait on National Forest lands is not pursuant to any Federal authorization. And because the Forest Service itself has not "authorized" the use of bait in hunting—through the National Policy or any other action—it has not taken Section 7 action and thus is not required to consult under Section 7. *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (explaining that Section 7 applies to private activity "only to the extent the activity is dependent on federal authorization"); *see also Karuk Tribe*, 681 F.3d at 1021 ("Where private activity is proceeding pursuant to a vested right or to a previously issued license, an agency has no duty to consult under Section 7 if it takes no further affirmative action regarding the activity." (citing *Cal. Sportfishing,* 472 F.3d at 595, 598–99)). This is true even though the Forest Service retains some

authority to regulate the use of bait. Put simply, an agency's unexercised *authority* to prohibit an activity is not itself the sort of affirmative agency action that triggers Section 7; if it were, that would swallow the principle that Section 7 does not encompass agency inaction.

This Court's decision in *Matejko* is particularly instructive on that point. *See* 468 F.3d at 1107–10. The *Matejko* plaintiffs argued that the Bureau of Land Management ("BLM") was required to consult on the effects of river and stream diversions by private individuals on public lands pursuant to pre-existing rights of way. *Id.* at 1102–03. Earlier statutes had recognized those rights of way, and through a policy statement and regulations, BLM embraced "a doctrine of prior appropriation and a general policy of deference to state and local law regarding water rights." *Id.* at 1103–06. BLM retained discretion to take enforcement action to protect public lands under certain conditions—when the diversions were more than "substantial deviation[s]" from prior uses—but it had not exercised that discretion. *Id.* at 1107. The plaintiffs argued that BLM's failure to regulate diversions constituted "action" for Section 7 purposes and thus required consultation. *Id.* at 1102.

This Court rejected that argument, holding that BLM's "failure to exercise discretion" was not "agency action" for Section 7 purposes. *Id.* at 1107. The Court noted the "affirmative nature" of the statutory words—"authorized, funded,

carried"—adding that the absence of "failure to act" from this list "stands in marked contrast to other sections of the ESA, which explicitly refer to an agency's failure to act." *Id.* at 1107–08 (citing 16 U.S.C. § 1540(g)(1)(C)). Thus, the Court reasoned that "'inaction' is not 'action' for section 7(a)(2) purposes." *Id.* at 1108 (also recognizing that the statutory language means "some agency actions are not covered"). The facts made clear that the "agency action" definition was not met: "The BLM did not *fund* the diversions, it did not *issue* permits, it did not *grant* contracts, it did not *build* dams, nor did it *divert* streams." *Id.* at 1109. Rather, the Court explained, "the private holders of the vested rights diverted the water, beginning a long time ago." *Id.* And even though BLM adopted a policy statement and regulations regarding its authority to regulate such diversions, the Court emphasized that "BLM did not affirmatively act and was 'not an entity responsible for [the challenged] decisionmaking.'" *Id.* (quoting *Defs. of Wildlife v. U.S. Env'l Prot. Agency*, 420 F.3d 946, 968 (9th Cir. 2005)).

The National Policy constitutes similar "inaction." *Compare Matejko*, 468 F.3d at 1105 (BLM regulations "reflect[ing] long-standing law and BLM's historical practice by clarifying that 1866 Act rights-of-way are not subject to regulation so long as a right-of-way is being operated and maintained in accordance with the scope of the original rights granted"), *with* 60 Fed. Reg. at 14,720 (National Policy providing that, "[w]here baiting is allowed by States, the

34

practice would continue on National Forest System lands unless the authorized officer [from the Forest Service]. . . determine[s] on a site-specific basis that the use of bait conflicts with Federal laws or regulations, forest plan direction, or other uses or users"). The National Policy does not "affirmatively authorize[] hunters" to use bait, as Plaintiffs claim, *see* Opening Br. 25—as demonstrated by the fact that many states continue to prohibit the practice. The National Policy does not grant any licenses or permits to private parties authorizing them to hunt with bait—or even to hunt black bears generally. *Accord Matejko*, 468 F.3d at 1109; *see also* 50 C.F.R. § 402.02. Rather, it "maintained the substantive *status quo*," deferring to state law and leaving states to decide whether or not to permit the use of bait. *See Fund for Animals*, 127 F.3d at 84. And because the Forest Service does not authorize the use of bait in hunting, it does not cause any alleged grizzly bear takes connected to the use of bait.

Plaintiffs' real grievance is that the Forest Service has *not* acted to prohibit the use of bait in black bear hunting. But *Matejko* makes clear that such lack of action does not create a duty to consult (or reinitiate consultation) under ESA Section 7. *See* 468 F.3d at 1108; *see also Int'l Ctr. for Tech. Assessment v. Thompson*, 421 F. Supp. 2d 1, 11 (D.D.C. 2006) (rejecting argument that agency's decision not to regulate genetically modified fish was "an affirmative action authorizing and approving" private company's commercialization of the fish).

Still, grizzly bears in Idaho and Wyoming remain protected under the ESA by operation of an ESA Section 4(d) rule that applies Section 9 take prohibitions to grizzly bears. 16 U.S.C. §§ 1538(a)(1)(B), (G), 1532(19), 1533(d); 50 C.F.R. § 17.40(b). It is generally illegal under Federal law to take a grizzly bear in these states without authorization, and no such authorization has been granted in connection with the use of bait. *See* 50 C.F.R. § 17.40(b). As this Court has explained, "Congress has . . . indicated that when a wholly private action threatens imminent harm to a listed species the appropriate safeguard is through section 9 . . ., and not section 7." *Sierra Club*, 65 F.3d at 1512; *see also Matejko*, 468 F.3d at 1110 n.9 (noting that plaintiff or others could file suit under ESA Section 9 against particular water diversions to halt "takings" of threatened species, if such diversions jeopardized species or their critical habitat).

Plaintiffs, however, only raise a Section 7 challenge in this case. And because the Forest Service has taken no Section 7 "action," it never had a Section 7 duty to consult with FWS on its National Policy deferring to states on the regulation of hunting with bear bait. The Court's inquiry can and should end there.

## B. Plaintiffs' reasons for requiring consultation on the National Policy lack merit.

In their opening brief, Plaintiffs contend that the National Policy is an agency action under Section 7 for three reasons. *See* Opening Br. at 22–23. Each is without merit.

36

First, Plaintiffs state that the National Policy "either 'allows' or 'prohibits' the use of bait in hunting in national forests depending on state law." *Id.* at 22. But that last phrase—"depending on state law"—is irreconcilable with their argument that the Policy itself allows or prohibits the use of bait in hunting. Deferring consistent with historic practice to another sovereign as to whether a practice should be permitted—a question those sovereigns have answered in different ways—is not tantamount to an affirmative action authorizing or prohibiting that activity. And Plaintiffs themselves repeatedly acknowledge that states, not the Federal government, authorize the use of bait in resident game hunting. *See, e.g.*, *id.* at 8 (stating that case is about the overlap where grizzlies may be present "in Idaho and Wyoming and where *those states allow* the use of bait to hunt black bears" (emphasis added)); *id.* at 10 ("Generally, states authorize use of bait to hunt black bears during fall and spring hunting seasons."); *id.* at 16 n.5 ("Montana does not allow the use of bait."); *id.* at 17 ("[T]he Forest Service noted numerous areas within . . . Idaho and Wyoming where the *states authorize* the use of bait" (emphasis added)); *id.* at 25 (stating that the Policy "allow[s] baiting where states allow the practice"). As the record and Plaintiffs' own brief make clear, the Forest Service has chosen not to preempt states' traditional authority to decide whether to allow the practice of using bear bait in hunting on National Forest lands within their borders.

Second, Plaintiffs state that the National Policy "requires the Forest Service to monitor any baiting," "to supervise response to the effects of baiting[,] and to intervene if unresolved conflicts with Federal interests arise." Opening Br. at 22. As a result, Plaintiffs assert that the National Policy "manifests continued federal oversight, control, and a mandate to act if state laws and regulations related to baiting conflict with the ESA." *Id.* at 24.

However, oversight and monitoring, without more, are not sufficient "actions" to trigger Section 7 consultation because they do not authorize, fund, or carry out hunting with bear bait or affect listed species or designated habitat. Rather, they merely constitute unexercised discretion and inaction, which this Court has repeatedly stated are "not 'action[s]' for section 7(a)(2) purposes."[10] *Matejko*, 468 F.3d at 1107–08; *CBD v. EPA*, 847 F.3d at 1091 ("[T]he retention of discretionary control is necessary but insufficient to trigger an agency's duty to initiate consultation." (quotation omitted)); *Cal. Sportfishing*, 472 F.3d at 598. Indeed, the Policy is clear that it does *not* require any Forest Service officer "to undertake a specific decision to allow baiting on National Forest System lands in

---

[10] Plaintiffs appear to have abandoned their argument, raised in the district court, that the Forest Service has "periodically implemented" the National Policy through closure orders. Nevertheless, that argument was erroneous, as the National Policy is merely a statement of policy, not an affirmative action to be implemented. Moreover, whether the Forest Service has issued closure orders on occasion is immaterial to the question before this Court—whether the National Policy itself affirmatively authorizes the use of bait on National Forest lands.

those States where the practice is permitted." 60 Fed. Reg. at 14,723. It is thus not itself an action that triggers Section 7.

Finally, Plaintiffs assert that the National Policy "ended a closed-unless-open permitting regime and replaced it with a permissive open-unless-closed regime, authorizing the practice in places under conditions it was previously prohibited." Opening Br. at 22–23.

The D.C. Circuit rejected this argument in *Fund for Animals*. There, the court explained that the Forest Service was already deferring to state regulations outside of Wyoming at the time the National Policy was adopted. *Fund for Animals*, 127 F.3d at 83–84 (explaining that the Policy thus "had no effect outside Wyoming"). And because Wyoming's regulations "var[ied] only insignificantly from those of the federal special use permit conditions they replaced," the National Policy "maintained the substantive *status quo*." *Id.*

Moreover, Plaintiffs' argument logically fails for the same fundamental reason outlined above. The National Policy could just as soon be called a "closed-unless-opened regime"—*i.e.*, the use of bait is prohibited unless states permit the practice. The key is that the Policy itself does not "authorize" the use of bait. State law does.

### C.    The National Policy is readily distinguishable from examples of agency action cited by Plaintiffs.

Plaintiffs attempt to liken the National Policy to agency actions from other cases where this Court has found a duty to consult under Section 7. Each comparison falls short.

First, the Forest Service's Policy of deferring to state hunting laws is clearly distinguishable from forest plans. *Contra* Opening Br. at 27. Forest plans "are comprehensive management plans governing a multitude of individual projects" in specific forests, and thus have "ongoing and long-lasting effect even after adoption." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994). For example, the forest plan in *Pacific Rivers* "set[] guidelines for logging, grazing and road-building activities within" a defined management area and "establish[ed] the allowable sale quantity of timber as well as production targets and schedules for forage, road construction, and other economic commodities." *Id.* at 1055. The forest plan amendments in *Cottonwood* "set specific guidelines and standards for permitting activities that are determined likely to have an adverse effect on Canada lynx," and individual projects were evaluated against the standards and guidelines in those amendments. 789 F.3d at 1078, 1082. And the interim forest management strategy in *Lane County Audubon Society v. Jamison* "outline[d] in detail the various criteria that will be used to develop the 1991 and 1992 timber sales," contained a detailed four-phase plan, and established "total annual allowable

harvests." 958 F.2d 290, 294 (9th Cir. 1992). The Court explained that each individual timber sale's impact "cannot be measured without reference to the management criteria established" in the strategy. *Id.*

The National Policy statement contains no specific guidelines for future activities. It simply directs the authorized Forest Service officer to confer with the state if the officer determines that state laws and regulations are inadequate to protect forest resources, the effects of bait use are inconsistent with the applicable forest plan, or state law conflicts with Federal law. 60 Fed. Reg. at 14,723. And it further directs the officer to close the area to the use of bait or restrict the practice if conferring with the state does not resolve the issue. *Id.* This language does not establish a planning directive or "establish[] criteria for *future* private activity." *See BOEM*, 36 F.4th at 884 (citing *Pac. Rivers*, 30 F.3d at 1053). Instead, it reflects a retention of authority, consistent with historical practice. *See CBD v. USFS*, 80 F.4th at 947 (noting that states have broad powers over wild animals within their jurisdiction "to the extent that state management is not incompatible with, or restrained by, the rights conveyed to the federal government by the constitution" (quotation omitted)). And it memorializes the "Forest Service's decision to refrain from future regulation of baiting" and "leav[e] baiting regulation to individual states" while reserving its discretion to act (or not act) in the future. *Fund for Animals*, 127 F.3d at 83 & n.3.

41

Plaintiffs also are incorrect that the National Policy constitutes Section 7 "action" under the ESA simply because the Forest Service prepared an EA pursuant to NEPA. *See* Opening Br. at 24–25 (citing *BOEM*, 36 F.4th at 884). The *BOEM* plaintiffs challenged the Federal government's programmatic authorization of unconventional oil drilling methods—"well stimulation treatments"—on drilling leases in the Pacific Outer Continental Shelf, an area beyond state boundaries and within exclusive Federal jurisdiction. *BOEM*, 36 F.4th at 865–66. The action agencies had prepared a programmatic EA and adopted the preferred alternative of allowing well stimulation treatments without restrictions on 43 current active leases and 23 operating platforms. *Id.* at 866. On review, this Court concluded that the agencies had issued an EA and "Finding of No Significant Impact" and had thus "affirmatively decided to allow the [well stimulation] treatments to proceed." *Id.* at 884 (quotation omitted). *BOEM* did not involve a Federal agency deciding whether or not to regulate an activity traditionally—and already—regulated by states. Instead, the Federal agencies in *BOEM* were deciding whether to authorize a certain type of activity on leases issued by those agencies and on areas exclusively regulated by the Federal government. *See id.* at 866. In fact, the agencies described the EA as a "decision support tool for future proposals." *Id.* at 883.

By contrast, the Forest Service issued the National Policy statement to reaffirm its longstanding policy of deferring to a state's regulation of hunting

practices—including the use of bait—on National Forest lands within that state's borders. Consequently, a hunter's use of bait is pursuant to state authorization, not any Federal authorization.

For similar reasons, the Forest Service's authorization of mining activities in *Karuk Tribe* is distinguishable from its issuance of the National Policy statement. *See* 681 F.3d at 1011. There, this Court found affirmative agency action where the Forest Service approved four notices of intent to conduct mining activities. *Id.* at 1021–22. But the Court repeatedly emphasized that, "[b]y regulation, the Forest Service must authorize mining activities before they may proceed." *Id.* at 1021, 1024 ("[T]he Forest Service authorizes mining activities when it approves a [notice of intent] and affirmatively decides to allow the mining to proceed."). Here, by contrast, *states* must authorize hunters to use bear bait before they may proceed. And the National Policy's deference to state law does not amount to an *affirmative decision* by the United States on whether hunting with bait may proceed.

In sum, the Forest Service's issuance of a National Policy statement reaffirming the agency's deference to state law on the use of bait in hunting was not an agency "action" under Section 7, and thus the Forest Service had no duty to engage in Section 7 consultation.

43

**III.    Because the Forest Service had no duty to consult on the National Policy, it has no duty to reinitiate consultation.**

Despite the fact that the National Policy was never a Section 7 action in the first place, Plaintiffs argue that the Forest Service must reinitiate consultation on the National Policy because it retains authority to regulate the use of bait under the Constitution's Supremacy Clause and Federal statutes delegating regulatory powers to the Forest Service. *See* Opening Br. at 28–30. And Plaintiffs claim that reinitiation is required based on two developments that constitute "new information [that] reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." *Id.* at 30–32 (citing 50 C.F.R. § 402.16(a)(2)).

But, as with an agency's initial duty to consult, mere possession of discretion to act is not sufficient to require reinitiation of consultation in the absence of affirmative agency action. The ESA implementing regulations require reinitiation where "discretionary Federal involvement or control over the action has been retained or is authorized by law," 50 C.F.R. § 402.16(a); it is the *affirmative* agency action that triggers the duty to initiate consultation in the first instance and then to reinitiate consultation if circumstances warrant, *see id.* § 402.16(a)(2). Without an ESA Section 7 action, there is no requirement that an agency undertake—or reinitiate—Section 7 consultation. The "new information" trigger for reinitiation of consultation is not relevant in absence of an affirmative

44

agency action requiring consultation initially. *See id.* (reinitiation of consultation required "[i]f new information reveals effects *of the action* that may affect listed species or critical habitat" in ways "not previously considered" (emphasis added)).

In other words, neither consultation in the first instance nor reinitiation of consultation can be required merely because the Federal agency has some unexercised authority to act. *See also Matejko*, 468 F.3d at 1108 ("[E]ven assuming the BLM could have had some type of discretion here to regulate the diversions (beyond a 'substantial deviation'), the existence of such discretion without more is not an 'action' triggering a consultation duty."). And here, for the reasons outlined above, there is no affirmative agency action to trigger consultation in the first instance or reinitiation of consultation.

As stated earlier, Plaintiffs' real grievance is that the Forest Service has *not* acted to prohibit the use of bait in black bear hunting on National Forest lands, deferring instead to state management of hunting. But Federal agency inaction does not create a duty to consult under ESA Section 7, *see Matejko*, 468 F.3d at 1108, and Plaintiffs' identification of purported "new information" in the absence of an ESA Section 7 action cannot create a duty to reinitiate consultation where no duty to consult exists in the first place.[11]

---

[11]    Plaintiffs' arguments about "new information" are inapt in any event. First, Plaintiffs assert that the Federal Defendants have not considered effects of the National Policy on grizzly bears given the species' expanded range, and they

45

# CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant

of Appellees' motions for summary judgment.

---

emphasize that the "BiOp is based on data from the early 1990s, was limited to
Wyoming, and did not and could not consider effects to grizzlies in areas of
national forests that were then-unoccupied." Opening Br. at 32. But this argument
confuses the Region 2 Policy with the National Policy, and the formal consultation
for the Region 2 Policy (the 1993 Region 2 BiOp and ITS) with the informal
consultation for the National Policy (the 1995 National Policy LOC), which
assessed the effects of the Policy on grizzly bears nationally and determined that it
was not likely to adversely affect the species. *See* ER-153. And, as previously
noted, the Forest Service withdrew its requests for consultation, and FWS then
withdrew the consultation documents; there is no consultation to "reinitiate."

Second, Plaintiffs contend that grizzly bears have been killed by hunters
using bait on National Forest lands in Wyoming and Idaho on three occasions.
Opening Br. at 32. But these events were not authorized, funded, or carried out by
the Forest Service, nor were they the result of any action by the Forest Service.
They cannot convert inaction (the Forest Service's unexercised discretion) into
affirmative action requiring ESA Section 7 consultation or reinitiation of
consultation. And any ESA claim based on the unlawful taking of a grizzly bear in
these instances would be time barred, as each of these events occurred over a
decade before Plaintiffs filed their complaint on June 5, 2019. *See id.* at 32–33
(citing ER-106 ¶ 56 (stating a grizzly bear was killed on May 28, 2007); ER-106
¶ 57 (stating a grizzly bear was killed September 3, 2007); ER-106 ¶ 50 (stating a
grizzly bear was killed on April 24, 2001)); *see also* 28 U.S.C. § 2401(a) (setting
forth six-year statute of limitations for civil claims against the United States).

Respectfully submitted,

/s/ *Amy E. Collier*
TODD KIM
*Assistant Attorney General*

Of Counsel:                                    ANDREW M. BERNIE
MELANIE PUGH                           ROBERT P. WILLIAMS
*Attorney*                                       AMY E. COLLIER
Office of the General Counsel        *Attorneys*
U.S. Department of Agriculture    Environment and Natural Resources Division
                                                    U.S. Department of Justice
RUTH HAMILTON HEESE            Post Office Box 7415
LYDIA GRIMM                            Washington, D.C. 20044
*Attorneys*                                      (202) 616-2625
U.S. Fish and Wildlife Service       amy.collier@usdoj.gov

November 27, 2023
DJ # 90-8-6-08281

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**          23-35352

I am the attorney or self-represented party.

**This brief contains 11,218 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
     29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
     *(select only one)*:
     [ ] it is a joint brief submitted by separately represented parties;
     [ ] a party or parties are filing a single brief in response to multiple briefs; or
     [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**     s/ Amy E. Collier

**Date**          November 27, 2023

48

# ADDENDUM

16 U.S.C. § 1536(a) & (b)(4) ....................................................................1a

50 C.F.R. § 402.02 ..................................................................................3a

50 C.F.R. § 402.13 ..................................................................................4a

50 C.F.R. § 402.16(a) ..............................................................................5a

## 16 U.S.C. § 1536(a), (b)(4)

## Interagency cooperation

(a) Federal agency actions and consultations

(1) The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

(3) Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

(4) Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 1533 of this title or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

(b) Opinion of Secretary

….

(4) If after consultation under subsection (a)(2), the Secretary concludes that--

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

(C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that--

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

## 50 C.F.R. § 402.02

## Definitions (excerpt)

Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to:

(a) actions intended to conserve listed species or their habitat;

(b) the promulgation of regulations;

(c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or

(d) actions directly or indirectly causing modifications to the land, water, or air.

# 50 C.F.R. § 402.13

## Informal Consultation

(a) Informal consultation is an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non–Federal representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required.

(b) During informal consultation, the Service may suggest modifications to the action that the Federal agency and any applicant could implement to avoid the likelihood of adverse effects to listed species or critical habitat.

(c) If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.

> (1) A written request for concurrence with a Federal agency's not likely to adversely affect determination shall include information similar to the types of information described for formal consultation at § 402.14(c)(1) sufficient for the Service to determine if it concurs.

> (2) Upon receipt of a written request consistent with paragraph (c)(1) of this section, the Service shall provide written concurrence or non-concurrence with the Federal agency's determination within 60 days. The 60–day timeframe may be extended upon mutual consent of the Service, the Federal agency, and the applicant (if involved), but shall not exceed 120 days total from the date of receipt of the Federal agency's written request consistent with paragraph (c)(1) of this section.

## 50 C.F.R. § 402.16(a)

## Reinitiation of Consultation

(a) Reinitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

(1) If the amount or extent of taking specified in the incidental take statement is exceeded;

(2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

(3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or

(4) If a new species is listed or critical habitat designated that may be affected by the identified action.