## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NWINTH CIRCUIT

WILDEARTH GUARDIANS, WESTERN WATERSHEDS PROJECT, and
WILDERNESS WATCH,

*Plaintiff–Appellants*;

v.

UNITED STATES FOREST SERVICE and UNITED STATES FISH &
WILDLIFE SERVICE,

*Defendant–Appellees*; and

IDAHO FISH & GAME COMMISSION, STATE OF WYOMING,

*Intervenor-Defendant-Appellees*

On Appeal from the United States District Court
for the District of Idaho, Hon. Magistrate Judge Dale

## APPELLANTS' REPLY BRIEF

SANGYE INCE-JOHANNSEN
PETER M. K. FROST
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
1.541.778.6626, 1.541.359.3238

*Attorneys for Plaintiff-Appellants*                    January 24, 2024

Table of Contents.

Table of Contents. ...................................................................................i

Table of Authorities. ..............................................................................ii

Summary of Reply Argument. .................................................................1

Facts. ......................................................................................................1

Argument....................................................................................................5

   1.  "Withdrawal" of Consultation Was Never Reached or Decided. ...................5

   2.  The Policy is "Agency Action" Under Section 7............................................7

   3.  The Forest Service Retains Discretionary Control Over Use of Bait. ..........11

   4.  New Information Exists that Was Not Previously Considered.....................12

Conclusion................................................................................................15

Certificate of Compliance .......................................................................17

Table of Authorities.

Cases:

*All. for Wild Rockies v. Probert*,
　412 F. Supp. 3d 1188 (D. Mont. 2019) ............................................................. 12

*Conservation Cong. v. Finley*,
　774 F.3d 611 (9th Cir. 2014) .............................................................................. 11

*County of Okanogan v. Nat'l Marine Fisheries Serv.*,
　347 F.3d 1081 (9th Cir. 2003) ............................................................................ 12

*Crow Indian Tribe v. United States*,
　965 F.3d 662 (9th Cir. 2020) .............................................................................. 14

*Forest Guardians v. Johanns*,
　450 F.3d 455 (9th Cir. 2006) .............................................................................. 11

*Fund for Animals, Inc. v. Thomas*,
　127 F.3d 80 (D.C. Cir. 1997) ....................................................................... 10, 11

*Karuk Tribe of California v. U.S. Forest Serv.*,
　681 F.3d 1006 (9th Cir. 2012) (*en banc*) ........................................................... 7

*Kleppe v. New Mexico*,
　426 U.S. 529 (1976) ............................................................................................. 7

*Marbled Murrelet v. Babbitt*,
　83 F.3d 1068 (9th Cir. 1996) .............................................................................. 10

*Nat'l Wildlife Fed'n. v. Espy*,
　45 F.3d 1337 (9th Cir. 1995) ............................................................................... 7

*Sierra Club v. Babbitt*,
　65 F.3d 1502 (9th Cir. 1995) .............................................................................. 11

*W. Watersheds Project v. Matejko*,
　468 F.3d 1099 (9th Cir. 2006) ............................................................................ 10

Statutes:

16 U.S.C. § 528 ..................................................................................... 12

16 U.S.C. § 1604(g)(3)(A) ................................................................... 12


Regulations:

50 C.F.R. § 402.16 ...................................................................... 11, 12, 15


Other:

*Use of Bait in Hunting*,
    60 Fed. Reg. 14,720 (Mar. 20, 1995) ............................................. 2, 8

*Record of Decision Concerning Grizzly Bear Recovery in the Bitterroot Ecosystem*,
    65 Fed. Reg. 69,644 (Nov. 17, 2000) ................................................. 4

*Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from
    the Federal List of Endangered and Threatened Species*,
    82 Fed. Reg. 30,502 (June 30, 2017) ........................................... 4, 14

## Summary of Reply Argument.

This appeal is based on a few main facts. In 1995, the Forest Service determined its Policy on the use of bait "may affect" grizzly bears, and consulted with FWS on whether it was likely to adversely affect the species. At the time, FWS concurred it would not. Its finding was influenced by the fact that, by 1995, black bear baiting was prohibited in "nearly all occupied grizzly habitat" in the lower 48 states. Since then, however, "occupied grizzly habitat" has expanded significantly out of two recovery zones into historic habitat in Montana, Wyoming, and Idaho, and grizzlies are starting to recolonize the Bitterroot recovery zone in Idaho, which is critical to the species' recovery. Idaho and Wyoming continue to allow the use of bait to hunt black bears where grizzlies are now present, and grizzlies have been killed at bait sites in both states. The issue is whether these facts constitute "new information" requiring reinitiation of consultation on the effects of the Policy, which remains in effect. This Court's answer should be yes.

## Facts.

The Federal Agencies assert Forest Service lands are generally open to "hunting," and the agency's current "regulation exempts hunting from special use authorization requirements." Fed. Br. 8–9. But that is misleading as to why, for fully 30 years from the 1960s to the 1990s, national forests in Wyoming required special use permits to use bait to hunt black bears in grizzly habitat. ER 196.

Then—as now—many hunters came to Wyoming from out-of-state and hired local outfitters or guides, which made these "commercial" activities requiring special use authorization. ER 148, 169. More important, before 1992, Wyoming "had no regulations covering the placement and removal of bear baits," even in grizzly habitat. ER 173. The "[u]nrestricted use of bear baits" in Wyoming had significant adverse effects, including at least five grizzlies shot and killed at bait sites, so individual national forests regulated bait via special use authorizations. *Id*.; ER 161. These were not actions undertaken by rogue national forests defying agency regulations; they were prudent decisions to mitigate the threat of more grizzly mortalities from widespread, unregulated bear baiting in that state.

In 1993, the same forests in Wyoming switched to issuing "closure orders," which the Policy later adopted as the right response "[w]here the authorized officer determines that baiting must be restricted or prohibited." *Use of Bait in Hunting*, 60 Fed. Reg. 14,720, 14,723 (Mar. 20,1995). But it was only after Wyoming adopted *all* of the closure orders the Forest Service imposed in the early 1990s, and *all* protective reporting and monitoring duties in the BiOp, that the Forest Service lifted the complete ban on baiting in Wyoming, and adopted the Policy. ER 154, 156.

Second, during the same period from the 1960 to 1990s, the Forest Service did not need to address baiting and grizzlies in the NCDE, because Montana did

not (and does not) allow the use of bait to hunt. ER 201. Idaho did (and does), and although at that time there were grizzlies in Idaho in the Cabinet-Yaak and Selkirk recovery zones near the Canada border, there were relatively few.[1] So when the Forest Service considered the effects on grizzlies at that time of adopting the Policy, it focused on Wyoming alone. SER 77–78.

Third, as noted, after Wyoming adopted all of the Forest Service's closure orders, and the Forest Service adopted the Policy, it found that, at that time, "[b]aiting for black bears is prohibited in nearly all occupied grizzly habitat" in the lower 48 states. SER 102. Since then, the distribution of grizzlies has expanded significantly out of both the NCDE and GYE recovery zones into adjacent grizzly "demographic monitoring areas" and, even farther out, areas where "outlier" grizzlies are now documented in Idaho and Wyoming. Open Br. 9 (map). As a result, as the Forest Service noted in 2019, west from the GYE recovery zone in Idaho, "grizzly distribution extends well beyond the [primary conservation area] into areas of [Idaho] where baiting is allowed." ER 108. Farther west in Idaho, baiting occurs in the Nez Perce-Clearwater National Forests, where in 2019 a grizzly was documented near a black bear bait site during the hunting season, ER

---

[1]  In 1982, the Grizzly Bear Recovery Plan noted "less than 15" grizzlies in the Cabinet Mountains part of the zone, and "a small yet unknown number" in the Yaak portion. Mot. to Take Judicial Notice, Exhibit, 6 (Plan at 12). For the Selkirks, the overall population was "unknown," but 26–36 grizzlies were known to occur in one-third of the zone. *Id*.

65–66, and south in the Caribou-Targhee National Forest, where in 2021 a grizzly sow and her cub were documented where baiting is allowed. ER 56–57. Even now, Idaho allows the use of bait to hunt black bears next to the Cabinet-Yaak Grizzly Bear recovery zone in northern Idaho.[2] Similarly, as to current baiting in Wyoming, the Forest Service found in 2019 that "there are significant areas within occupied grizzly bear range where baiting is allowed." ER 108.

It is undisputed that grizzlies in these newly-reoccupied areas are critical to the species' recovery, because they are needed to make it safely to protected areas, to enhance the genetic health of grizzlies within populated ecosystems, *Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Wildlife*, 82 Fed. Reg. 30,502 at 30,535 (June 30, 2017), and to recolonize the Bitterroot Ecosystem. *Record of Decision Concerning Grizzly Bear Recovery in the Bitterroot Ecosystem*, 65 Fed. Reg. 69,644 (Nov. 17, 2000).

It is also undisputed that the BiOp found—and the concurrence did not

---

[2] ID Br. 12 n.5, citing "2023 Idaho Black Bear Hunting Seasons, *at* http://idfg.idaho.gov/sites/default/files/seasons-rules-big-game-2023-2024.pdf." Idaho allows bait to hunt black bears in game managment units 4, 4a, and 6, and states that in those units, and in many others: "Caution: grizzly bears may be encountered." *Id*. at 69–71. Game management unit map: https://data-idfggis.opendata.arcgis.com/datasets/IDFGgis::game-management-units/explore?location=43.774060%2C-109.843006%2C6.44. Cabinet-Yaak map: https://igbconline.org/committees/selkirk/

question—only a "remote" possibility a grizzly would be killed at a bait site. ER 163–64, ER 153. And yet since consultation on the effects of the Policy, a licensed black bear hunter using bait killed the first grizzly bear documented since 1946 in the Bitterroot Mountains in Idaho, ER 105–06 ¶ 57 & ER 102 ¶ 57; ER 93 ¶ 57, and a licensed black bear hunter using bait killed a grizzly in the Bridger-Teton National Forest in Wyoming. ER 105 ¶ 56 & ER 102 ¶ 56.

Argument.

1. <u>"Withdrawal" of Consultation Was Never Reached or Decided.</u>

At the outset, the Federal Agencies assert they have no duty to reinitiate consultation because they "withdrew" the BiOp and concurrence during the pendency of this case in the District Court. Fed. Br. 27–28. They then filed a motion to dismiss, asserting in part that no "agency action" under Section 7 existed when the Forest Service adopted the Policy, and the withdrawal mooted the case. ECF No. 38. Conservationists opposed their motion and sought leave to file a supplemental and amended complaint, challenging both (1) the continuing failure to reinitiate consultation and (2) the withdrawal. ECF No. 40. The District Court denied the motion to dismiss and granted the motion to file the new pleading. ECF No. 55. The District Court ruled "Plaintiffs' [reinitiation] claim . . . is not moot merely because the [Forest Service] purported to withdraw its requests for consultation, and the [Fish and Wildlife Service] purported to withdraw or rescind

the 1993 BiOp and 1995 Letter of Concurrence. This is because the 1993 BiOp

provides a basis for promulgation of the 1995 national policy, and the rule

adopting the policy has not been rescinded." *Id*. at 15, 17 ("the 1995 national

policy, which was formally adopted by rule, is still in effect.").

Accordingly, on cross-motions for summary judgment, Conservationists

challenged both (1) the continuing failure to reinitiate consultation and (2) the

withdrawal. ECF No. 93. However, the District Court explicitly "decline[d]" to

reach or decide whether the withdrawal was unlawful, "leav[ing] for another day"

whether "Defendants' post-hoc withdrawal or rescissions of these consultation

documents" is lawful. ER 49. Instead, the District Court stated its ruling in favor of

the Federal Agencies on the reinitiation claim "addressed the central issue pertinent

to this lawsuit": the Policy is not "agency action." *Id*.

Now on appeal, the Federal Agencies assert a "threshold defect" in

Conservationists' appeal, because they do not also challenge the withdrawal. Fed.

Br. 28. But as the District Court correctly found, the Federal Agencies' defense of

their failure to reinitiate consultation and their withdrawal of consultation is based

on the same legal theory—the Policy is not "agency action" in the first place. ER

49. If this Court disagrees, on remand, the District Court can decide if the post-hoc

withdrawal of consultation documents is unlawful. If the District Court determines

it was, it could restore the documents. *Nat'l Wildlife Fed'n. v. Espy*, 45 F.3d 1337,

1342–43 (9th Cir. 1995) (if the agency unlawfully conveyed title, on remand, the district court could rescind conveyance and restore title in the agency).

2.     The Policy is "Agency Action" Under Section 7.

The Policy is "agency action" under Section 7 because it meets all elements of this Court's test: it is an "affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed" in national forests, *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1011 (9th Cir. 2012) (en banc), and it did and continues to affect grizzlies.

First, the action of adopting the Policy was *affirmative*: it lifted a complete ban on use of bait in national forests in Wyoming, and instituted a new national Policy of oversight and continued control over use of any bait in national forests.

Second, the action of adopting the Policy was a *discretionary decision*: the Forest Service has "complete authority over the public lands includ[ing] the power to regulate and protect the wildlife living there," *Kleppe v. New Mexico*, 426 U.S. 529, 530 (1976), and the Forest Service had discretion to adopt any of the four alternatives in its 1995 EA: (Alternative 1): continue to require non-commercial hunters to obtain special use permits to use bait in national forests in Wyoming; (Alternative 2): rely only on state regulations as to use of bait in national forests; (Alternative 3): adopt the Policy; or (Alternative 4): choose "no action," leaving the ban on baiting in national forests in Wyoming in place, and allowing other

7

states to regulate baiting. ER 136, 139. Exercising its discretion, the Forest Service chose to adopt the Policy. ER 146.

Third, the plain language of the Policy establishes *conditions* for the activity to proceed: the "authorized officer *shall* continually monitor State hunting regulations with regard to the use of bait," and a "site-specific restriction or prohibition on baiting *shall* occur when the authorized officer determines that one or more of the following circumstances exists: [including] State laws and regulations are not adequate to protect forest land, other resources, or users in a particular location," or "State laws and regulations conflict with Federal law, such as the Endangered Species Act." 60 Fed. Reg. at 14,723 (emphases added). The Policy also establishes the process by which the Forest Service shall act in terms of consulting with a state, and if "unable to resolve the matter . . . the authorized officer *shall* close the area to baiting or otherwise restrict baiting by issuing an order." *Id*. (emphasis added).

Indeed, when the Forest Service issued a Decision Notice to adopt the Policy, it stated: "For the most part, the difference between the chosen alternative [the Policy] and past practices [requiring special use permits] is administrative" in the context of the effects on grizzlies of the use of bait. ER 148. In other words, the action of adopting the Policy did not change the Forest Service's oversight, control, or authority to prohibit or condition bait in any national forest; it merely

changed the agency's "administrative" means to do so. To confirm, in the same document, the Forest Service continued: "Furthermore, any environmental difference between this alternative and the other alternatives is that this alternative guarantees greater environmental protection; in that it *mandates* protective action on the part of the Forest Service if Federal resources are threatened." ER 147. (emphasis added).

The Federal Agencies' and the States' main response is the Policy merely reaffirms a historic "status quo" of federal deference to states to regulate hunting. ID Br. 14; Fed. Br. 1, WY Br. 15. The Policy actually changed the status quo.

For 30 years the Forest Service did not "defer" to Wyoming as to the use of bait to hunt black bears in national forests, because Wyoming did not regulate the practice, and grizzly bears were being shot and killed. And in fact, in its 1995 EA, the Forest Service expressly considered and *rejected* the alternative to "Rely only on State regulations to regulate baiting on [National Forest System] lands." ER 148. The Forest Service rejected relying only on state regulations because doing so would "not guarantee that Federal interests and resources will always be protected in all States that allow the practice of baiting, and adverse effects are therefore possible." SER 95. Instead, the Forest Service chose to adopt the Policy, allowing states to regulate baiting but mandating continued federal oversight, and closures if conflicts occur, specifically citing any conflict arising under the ESA

Next, the Federal Agencies and the States seek to match this case with *W. Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006). *Matejko* is inapposite. It concerned BLM's historic, uninterrupted "acquiescence" to private water diversions from streams on lands it managed. *Id*. at 1103. But BLM had not for 30 years required the diverters to obtain permits. BLM had never exercised its discretion and, for a period, flatly prohibited all diversions. BLM did not later make what it described as a merely "administrative" change as to its control over the diversions, and adopt a policy by which it would continue oversight and control over diversions. And BLM never adopted a provision codified in its own manual that states that it shall act to control the diversions when needed to protect ESA-listed species.

The Federal Agencies' and the States' reliance on two footnotes in *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 83 n.3, 84 n.6 (D.C. Cir. 1997) is also misplaced. Footnote 3 concerns "major federal action" under NEPA and does not define "agency action" under Section 7. *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996) ("major federal action" is "more exclusive" than the "probably more liberal standard" of "agency action"). Footnote 6 states: "If promulgation of the [National Policy] constituted 'inaction', there most probably would have been no 'agency action' to trigger the ESA consultation requirement." *Fund for Animals*, 127 F.3d at 84 n. 6 (internal citations omitted). This truism—

inaction is not action—cannot be fairly read as expressing or "reiterat[ing] . . . doubt that the National Policy was 'action' that required consultation at all," Fed. Br. 18, any more than it can be read to express doubt it was inaction. The D.C. Circuit simply acknowledged that it left unresolved an issue the parties raised.

3. <u>The Forest Service Retains Discretionary Control Over Use of Bait</u>.

Reinitiation of consultation is required "where discretionary Federal involvement or control over the action has been retained or is authorized by law," and any of four regulatory critieria is met. 50 C.F.R. § 402.16(a).[3] Discretionary involvement or control exists when the federal agency has "the ability to implement measures that inure to the benefit of protected species." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995). The text of the Policy speaks for itself, and proves the Forest Service retains the authority to implement (indeed, mandates) such measures. 60 Fed. Reg. at 14,723. The record states, and the Federal Agencies do not dispute, the Forest Service has continued discretionary control over bait in national forests. ER-129; Fed. Br. 45 ("the Federal agency has some unexercised authority to act."). For its part, Idaho appears to be silent on the issue, *cf.* ID Br. 27, while Wyoming asserts the Multiple-Use Sustained-Yield Act

---

[3] This Court has held that the duty to reinitiate consultation applies to informal consultation (completed in a concurrence), as well as formal consultation (completed in a BiOp). *Forest Guardians v. Johanns*, 450 F.3d 455, 458 (9th Cir. 2006); *Conservation Cong. v. Finley*, 774 F.3d 611, 619 (9th Cir. 2014) (same).

("MUSY") constrains the Forest Service's discretion over baiting. WY Br. 32–33.
But MUSY authorizes the Forest Service to administer its lands for "wildlife"
purposes, 16 U.S.C. § 528, as does the National Forest Management Act. 16
U.S.C. § 1604(g)(3)(A). This Court has held these statutes authorize the Forest
Service to exercise discretion to protect wildlife listed under the ESA. *County of
Okanogan v. Nat'l Marine Fisheries Serv.*, 347 F.3d 1081, 1085 (9th Cir. 2003).

      4.     <u>New Information Exists that Was Not Previously Considered</u>.

Among the regulatory criteria, reinitiation of consultation is required "[i]f
new information reveals effects of the action that may affect listed species or
critical habitat in a manner or to an extent not previously considered." 50 C.F.R. §
402.16(a)(2). "The crux of the matter is whether the new information reveals
*effects* that 'w[ere] not previously considered.'" *All. for Wild Rockies v. Probert*,
412 F. Supp. 3d 1188, 1204 (D. Mont. 2019) (quoting 50 C.F.R. § 402.16(b)
(emphasis added)).

Here, neither the BiOp nor concurrence on the Policy ever considered the
effects on grizzlies of the use of bait to hunt black bears in Idaho *at all*. The BiOp
evaluated the use of bait in grizzly habitat in Wyoming alone, ER 157, and when
the Forest Service sought concurrence on the Policy, it referred to the BiOp, and
noted actions in Wyoming alone. ER 154–55. In turn, the one-page concurrence

says nothing about effects on grizzlies of the use of bait in Idaho. ER 153.[4] And yet, as noted, since 1995, grizzlies have expanded their range, reoccupying habitat outside of both the NCDE and the GYE recovery zones into parts of Idaho where they have not existed for decades. *Supra* pp. 3–4. Currently, grizzlies dispersing from the NCDE are found within three miles of the Bitterroot recovery zone, ER 79; Open Br. 9 (map), and in 2019, a collared grizzly from the Cabinet-Yaak Ecosystem dispersed into the Bitterroot recovery zone. ER 80.

Further, grizzly distribution now extends well into areas of Idaho where the state allows the use of bait to hunt black bears. ER 108. Baiting occurs in Idaho just west of the GYE recovery zone, where grizzlies have now been documented. ER 56, 057. Baiting also occurs in Idaho immediately adjacent to the Cabinet-Yaak recovery zone, where Idaho warns hunters using bait: "Caution: grizzly bears may be encountered." *Supra* p. 4 n.2.[5]

For grizzlies in Wyoming, the 1995 consultation is outdated in two respects.

---

[4]  Wyoming cites the EA, not the BiOp or concurrence, to assert "the Forest Service did not confine its analysis to a specific area in Wyoming where bears were present in 1995." WY Br. 38. The EA is a NEPA document, and does not cure that the BiOp and concurrence never evaluated the use of bait in Idaho.

[5]  For the same area, the Forest Service issued an "Occupancy and Use Restrictions Order," prohibiting "storage of any food" including "attractants," FER 3, unless "stored in a commercial bear-resistant container or electric fence certified through the Interagency Grizzly Bear Committee," FER 5, intended to "protect public safety by reducing incidents of public contact with food habituated bears." SER 57.

First, by 2017, the GYE grizzly population had tripled its occupied range since grizzlies were listed, and had expanded into 92% of suitable habitat, up from 68% in the early 2000s. 82 Fed. Reg. at 30,502, 30,511–12. Second, as noted, the Forest Service found that by 2019, "there are significant areas within occupied grizzly bear range where baiting is allowed" in Wyoming. ER 109.

And it is not just the range of grizzlies that has changed significantly since 1995, it is also their number. When consultation occurred in 1995, there were 228 grizzlies in the GYE recovery zone. ER 160, 152. Seven years ago, there were over three times as many: 700 grizzlies. *Crow Indian Tribe v. United States*, 965 F.3d 662, 672 (9th Cir. 2020). For the NCDE, six years ago there were roughly 900 grizzlies, *id.*, and in 2023, there was a projected 1,163 grizzlies,[6] including some now within three miles of the Bitterroot recovery zone. ER 79; Open Br. 9 (map).

It is also undisputed that since the Policy was adopted, grizzlies have been shot and killed at black bear bait sites in both Idaho and Wyoming.[7]

All of this belies Wyoming's argument that grizzly populations "have

---

[6]   Northern Continental Divide Ecosystem Grizzly Bear Population Monitoring Team Annual Report (2022), at 10, available at: https://fwp.mt.gov/binaries/content/assets/fwp/conservation/bears/ncde_grizzly_po pulation_trend_report_2022_20230828.pdf (last accessed Jan. 23, 2024)

[7]  Wyoming does not dispute the mortalities; it asserts it can prosecute hunters that kill grizzlies. WY Br. 41. But that is irrelevant as to the new information of significantly expanded grizzly distribution, and baiting in the same areas.

expanded substantially over the life of the National Policy only reinforces the Forest Service's initial conclusion that its practice was not likely to adversely affect grizzly bear recovery." WY Br. 38. Whether the Policy when adopted was "not likely to adversely affect grizzly bear recovery" does not matter. The issue is not whether the premises for consultation in 1995 were correct; the issue is whether, since then, there is "new information" about effects on grizzlies of the use of bait in national forests that was "not previously considered." 50 C.F.R. § 402.16(a)(2).

The answer is yes: the consultation in 1995 did not consider the effects on grizzlies of the use of bait in Idaho. It did not consider the effects on grizzlies of the significantly increased populations from the NCDE and GYE. It did not consider that grizzlies have expanded into historic range in Wyoming, Montana, and even Idaho. It did not consider that grizzlies have been shot at bait sites. And it did not consider that since 1995, the goal of having recovered populations in three distinct ecosystems, ER 89, still has not been met. When grizzlies encounter bait in Idaho and Wyoming, and when they are shot near the Bitterroot recovery zone, these facts matter considerably as to the goal of recovering the species. This all represents "new information" the consultation 29 years ago did not consider.

## Conclusion.

This Court should reverse on the issue of whether the Policy was "agency

action," rule that "new information" exists, and remand for further proceedings.

Date: January 24, 2024.    Respectfully submitted,

/s/ Sangye Ince-Johannsen
SANGYE INCE-JOHANNSEN
PETER M. K. FROST
Western Environmental Law Center
*Attorneys for Plaintiff-Appellants*

Certificate of Compliance.

I certify this brief contains 3,806 words, and complies with FED. R. APP. P. 32(a)(7)(B)(i).

/s/ Sangye Ince-Johannsen
SANGYE INCE-JOHANNSEN
PETER M. K. FROST
Western Environmental Law Center
*Attorneys for Plaintiff-Appellants*